# IN THE SUPREME COURT OF TENNESSEE
# AT NASHVILLE
## October 9, 2014 Session

## STATE OF TENNESSEE v. JEREMY WENDELL THORPE

**Appeal from the Court of Criminal Appeals**
**Criminal Court for Davidson County**
**No. 2012-B-1224     Monte Watkins, Judge**

**No. M2012-02676-SC-R11-CD - Filed April 6, 2015**

We granted the application for permission to appeal of Jeremy Wendell Thorpe ("the Defendant") in this case to determine whether the trial court properly included a jury instruction for criminal attempt as a lesser-included offense of sexual battery by an authority figure. If we answer in the affirmative, we also must determine whether the evidence presented at trial was sufficient to support the Defendant's conviction for criminal attempt to commit sexual battery by an authority figure. After a thorough review of the record and applicable law, we hold that the trial court properly included a jury instruction for criminal attempt as a lesser-included offense of sexual battery by an authority figure and that the evidence is sufficient to support the Defendant's conviction. Accordingly, we affirm the decision of the Court of Criminal Appeals.

### Tenn. R. App. P. 11 Appeal by Permission; Judgment
### of the Court of Criminal Appeals Affirmed

JEFFREY S. BIVINS, J., delivered the opinion of the Court, in which SHARON G. LEE, C.J., and CORNELIA A. CLARK, GARY R. WADE, and HOLLY KIRBY, JJ., joined.

Dawn Deaner, District Public Defender; Jeffrey A. DeVasher, Assistant Public Defender (on appeal); and Kristin Neff and Aimee Solway, Assistant Public Defenders (at trial), Memphis, Tennessee, for the appellant, Jeremy Wendell Thorpe.

Robert E. Cooper, Jr., Attorney General and Reporter; Joseph F. Whalen, Acting Solicitor General; Leslie Price, Senior Counsel; Brent C. Cherry, Senior Counsel; Victor S. Johnson, III, District Attorney General; and Sharon Reddick and Sarah Blood, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

## Factual and Procedural Background

The Defendant was convicted by a jury on one count of criminal attempt to commit sexual battery by an authority figure. He subsequently appealed to the Court of Criminal Appeals, challenging the sufficiency of the evidence supporting his conviction. As part of that challenge, he claimed that the trial court erred by including criminal attempt to commit sexual battery by an authority figure in its jury instructions as a lesser-included offense of sexual battery by an authority figure. The Court of Criminal Appeals affirmed the judgment of the trial court. State v. Thorpe, No. M2012-02676-CCA-R3-CD, 2013 WL 5436701, at *10 (Tenn. Crim. App. Sept. 27, 2013).

This case arises out of alleged sexual misconduct by the Defendant upon the daughter ("the victim") of his girlfriend ("Mother") at the time. A Davidson County Grand Jury indicted the Defendant on two counts of aggravated sexual battery and one count of sexual battery by an authority figure. The Defendant proceeded to trial on July 23-25, 2012. At trial, the State presented proof from the following witnesses: the victim; Mother; Diane Smith, the victim's guidance counselor at Donelson Middle School; and Detectives Jeff Weaver and Jason Mayo with the Metropolitan Nashville Police Department ("MNPD").

The victim testified that she was thirteen years old during the summer of 2010, when the events underlying the Defendant's conviction occurred.[1] The victim stated that she had a brother ("Brother") who was approximately four years older than she. During the summer of 2010, the victim and Brother were living in an apartment in Hermitage with Mother and Mother's boyfriend, the Defendant. Mother had been dating the Defendant since 2008, and the Defendant had lived with the victim's family for most of that time. At first, the victim got along with the Defendant, but she noted that Brother did not like him. According to the victim, soon after the Defendant moved in with them, the Defendant "whupped" her and confiscated belongings from her and Brother.

Mother described the victim's relationship with the Defendant as "strained," stating, "My kids just never liked him." When Mother was at work, the Defendant was responsible for watching and disciplining her children. She denied, however, that she ever gave the Defendant permission to spank the victim.

---

[1] As discussed later, the alleged events pertaining to the other two indicted offenses, for which the Defendant was not convicted, occurred prior to the victim's thirteenth birthday.

The victim recalled one occasion when she was lying on her stomach on the couch in her living room "and [the Defendant] hit [her] on the butt." When this happened, the victim "made it known" to the Defendant that she was uncomfortable with that behavior. According to the victim, Mother was in the room but did not see the Defendant do anything and did not say anything to him about the behavior. On another occasion, when Mother was not home, the Defendant slapped the victim on her "butt" while she was washing dishes. The victim confirmed that both of these incidents occurred before her thirteenth birthday.[2] Prior to these incidents, the victim had been taught that no one should touch her in places that "a bikini would cover."

During the summer of 2010, the Defendant was unemployed, and Mother's work schedule on the weekends was from 7:00 p.m. until 7:00 a.m. every night. At some point during that summer, Mother and Brother had an argument that resulted in Brother's going to live with his grandmother in Memphis. Mother agreed that the argument involved the Defendant to some extent, but she could not remember the details of the argument. When the victim learned that Brother was going to live with their grandmother, she asked to go as well, but Mother told her that she was too young, and the Defendant said, "[A]bsolutely not." When Brother left, the victim was angry with both Mother and the Defendant and felt "[u]nsafe" living with the Defendant.

After Brother moved out of the family residence, the Defendant began exhibiting behavior toward the victim that "a boyfriend would do," such as rubbing her feet. Over time, the Defendant began kissing the victim's cheeks, which eventually led to his kissing her on her mouth and putting his tongue inside her mouth. When the Defendant stuck his tongue in the victim's mouth, the victim told him that such behavior was "not normal." The victim also told the Defendant, "If I'm going to have any kind of relationship with you it should be father/daughter, not sexual or anything of that nature." When the victim said this to the Defendant, the Defendant responded by putting his tongue in her mouth again. In other instances, when the victim would resist the Defendant's advances, the Defendant would punish her by taking away her belongings, such as her computer, phone, clothing, and shoes. To that end, she recalled multiple instances in which the Defendant confiscated her cell phone for rejecting him.

According to Mother, once Brother moved out, Mother observed the victim and the Defendant interacting more, which was something she had desired for them. Therefore, she did not see anything strange about their relationship. On one occasion in August 2010, however, Mother had fallen asleep on the couch with both the victim and the Defendant in

---

[2] It appears from the record that these two instances were the factual basis of the two counts of aggravated sexual battery. The jury was unable to reach a verdict on both of these counts.

the room. When she woke up, neither of them were around. Eventually, Mother observed the victim and the Defendant walk out of the victim's bedroom. Mother questioned both of them, and the Defendant told her that the victim was telling him what she planned to wear to school the next day. She did not recall ever seeing the Defendant's "smacking" the victim's rear end. Mother explained, however, that she had bronchitis over the summer and spent a lot of time sleeping when she was home.

On Friday, August 27, 2010, while Mother was at work, the victim received a text message from the Defendant asking her what she was wearing. She subsequently received another text message from the Defendant that stated, "I want to kiss on them thighs when I get back." The victim confirmed that the Defendant had said something similar to this in the past. The victim's response to this text message was "[O]kay," but she expressed at trial her concern that, had she rejected him, he would have taken away more of her belongings or torn her "down verbally." Shortly thereafter, she received another text message from the Defendant that stated, "Go put on some shorts," to which she again responded, "[O]kay." The Defendant later sent a text message that stated, "Easier to get to things that way."

When the Defendant returned home that evening, the victim had not yet changed into shorts and instead was wearing sweat pants. According to the victim, the Defendant became angry, yelling at the victim to go change and accusing her of making "everything so difficult." As a result, the victim changed into shorts, and the Defendant "came into [her] room and he kissed . . . [her] inner thighs." She explained that his hands were holding her outer thighs and that he kissed up to her bikini line. The victim cried while the Defendant kissed her. After he finished, he told her, "I know it hurt you but it's okay."

Prior to school on the Monday following this incident on Friday, the Defendant demanded that the victim change out of the shorts she was wearing and into "some big pants." The victim was late for school because she had to wash and dry the pants that the Defendant wanted her to wear. On cross-examination, the victim acknowledged that on Sunday, August 29, 2010, the Defendant and Mother went shopping for clothes for the victim because Mother believed that the victim's clothes were too tight. Mother recalled that, on that morning, she awoke to the Defendant's telling her about an argument he had with the victim in which he asked her to change out of the clothes she was wearing that were too small.

The victim testified that she mostly stayed in her room for the rest of the weekend but eventually contacted her grandmother about the situation. Her grandmother instructed the victim to tell a counselor. The victim also told her friend about the incident, who suggested that she tell someone at school. Accordingly, on the Monday following the incident on

Friday, the victim went with her friend to speak with the school guidance counselor. The victim prepared a written letter because she "knew [she] was going to fall apart."

Diane Smith, a counselor at Donelson Middle School, testified that she had worked with children as a teacher or counselor for thirty-three years. On Monday, August 30, 2010, the victim came to her office with a handwritten note. According to Smith, the victim told her that "when her brother was away from home that the [Defendant] would ask her to put on some white shorts usually. And he would start kissing between her legs up in her inner thighs." As the victim told Smith this information, the victim cried and said that "she just couldn't . . . do this any longer and she knew it was going to get worse."

After the victim finished telling Smith what happened, Smith reported it to the Department of Children's Services ("DCS") and to the school's resource officer. When Smith asked the victim whether she had told Mother, the victim stated that she was afraid Mother "would not believe [her] and take the side of the [Defendant]." In general, Smith perceived the victim to be "normal" for her age in that "[t]here was a lot of innocence to her [and] a lot of sweetness to her."

After speaking with Smith, the victim met with two detectives from the MNPD. Detective Jason Mayo, with the Sex Crimes Unit of the MNPD, testified that, when he first met with the victim on August 30, 2010, the victim told him that "she was being sexually harassed by her mother's boyfriend." He continued, "[The victim] said that about three weeks ago she started receiving sexually charged text messages from [the Defendant]. She said that he had kissed her on her inner thigh. She said that he had smacked her on the butt and rubbed and kissed her feet." The victim also told Detective Mayo that, when she would resist, the Defendant would confiscate some of her belongings such as her clothes, computer, and mobile phone. Additionally, the victim stated that the Defendant "basically would cuss her out and tell her what a bad person she was if she didn't do what he asked her to do." The victim provided Detective Mayo with her mobile phone, which she told him contained text messages from the Defendant. Detective Mayo denied that the victim seemed "overly sexual" for a thirteen-year-old girl.

Detective Mayo agreed that the text message records, which had been introduced as evidence through Detective Jeff Weaver from the Tech Unit of MNPD, indicated that the victim sent 776 text messages to the Defendant in August of 2010. These text messages included the following messages to the victim from the Defendant: "What do you have on"; "I wanna kiss on them thighs when I get back"; "You gonna put on some shorts"; and "Easier to get to them that way." Although most of the conversations between the Defendant and the victim were initiated by the Defendant, Detective Mayo acknowledged that a few of the conversations were initiated by the victim, as well.

Detective Mayo testified that, in a situation such as this, where the alleged incident was kissing from two days prior, he would not have sought a physical examination of the victim because any evidence would have been rubbed or washed away. Moreover, an incident such as this likely would not yield visible injuries that a physical examination might reveal.

Following the detectives' interview with the victim, they met separately with Mother and the Defendant, who had been summoned to the school. In meeting with Mother, the detectives informed her of the victim's allegations that the Defendant had touched the victim inappropriately.

Mother recalled that, when she first learned about the victim's allegations, she was angry with the Defendant and also upset with the victim for not telling her first. She acknowledged that she also wondered whether the victim had made these allegations simply "to try to cause more problems," but she did believe there was a possibility that the allegations were true.

Following the detectives' meeting with Mother, they spoke with the Defendant, and an audio recording of the detectives' conversation with the Defendant was played for the jury. In the recording, Detective Mayo informed the Defendant of the victim's allegations, to which the Defendant responded that "nothing happened." The Defendant agreed that he sent text messages to the victim "from time to time" but stated that none of those messages were still on his phone because his phone automatically deleted the messages. He denied that he ever sent any text messages that could have been construed as inappropriate.

Detective Mayo denied that, in the time since these allegations arose, the Defendant ever had come to him and told him that the victim had lied, that she was "overly sexualized," or that the victim and the Defendant were involved in a consensual relationship.

After Mother spoke with the detectives, she walked out to the parking lot without speaking to the Defendant. Eventually, following his own meeting with the detectives, the Defendant joined her. Mother recalled that the Defendant was angry and claimed that the victim was making up everything. Regarding the Defendant's reaction, Mother testified, "[H]e was just telling me that, . . . I should take his side and I should just leave with him and not worry about what happened to [the victim] and not be concerned about what was going on with my child." Mother decided to have the victim go stay with her mother, the victim's grandmother.

Accordingly, after school that day, the victim was transported to the DCS and then to her grandmother's house in Memphis, where she spent the night. The victim confirmed that,

even prior to the events on August 27, she wanted to move in with her grandmother because she did not get along with the Defendant. She denied, however, fabricating this story in order to get to live with her grandmother.

Because Mother decided to stay in Nashville with the Defendant, she had no contact with the victim and never heard the victim's perspective of the alleged incidents. Once she learned about the existence of the text messages between the victim and the Defendant, Mother ended her relationship with the Defendant. Mother had spoken with the Defendant once following his indictment in this case, and the Defendant told her that "he hoped one day he could explain [the situation] to [her]."

Following the conclusion of the State's case-in-chief, the Defendant moved for a judgment of acquittal, which the trial court denied. The Defendant also moved for a mistrial, given that the trial court previously had denied the severance of counts one and two from count three in the indictment. The trial court also denied this motion. The Defendant chose not to testify and presented no proof. Following deliberations, the jury convicted the Defendant of the lesser-included offense in count three of criminal attempt to commit sexual battery by an authority figure. With respect to counts one and two, the jury was unable to reach a verdict. Following a sentencing hearing, the trial court sentenced the Defendant to three years and six months' incarceration.

The Defendant filed a motion for new trial, which the trial court denied following a hearing. The Defendant timely appealed, arguing that the trial court erred in its inclusion of criminal attempt as a lesser-included offense of sexual battery by an authority figure in its jury instructions and challenging the sufficiency of the evidence. The Court of Criminal Appeals affirmed the Defendant's conviction. Thorpe, 2013 WL 5436701, at *10. This Court granted the Defendant's application for permission to appeal.

## Analysis

### *Jury Instruction*

This case provides us with an opportunity to clarify those circumstances in which a trial judge should instruct the jury on the crime of criminal attempt. Our criminal code defines the crime of criminal attempt as follows:

(a) A person commits criminal attempt who, acting with the kind of culpability otherwise required for the offense:

-7-

(1) Intentionally engages in action or causes a result that would constitute an offense, if the circumstances surrounding the conduct were as the person believes them to be;

(2) Acts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part; or

(3) Acts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense.

(b) Conduct does not constitute a substantial step under subdivision (a)(3), unless the person's entire course of action is corroborative of the intent to commit the offense.

Tenn. Code Ann. § 39-12-101(a), (b) (2010). Significantly, this statute also provides that "[i]t is no defense to prosecution for criminal attempt that the offense attempted was actually committed." Id. § 39-12-101(c).

Specifically in this case, the Defendant argues that the trial court erred by including criminal attempt in its jury instructions as a lesser-included offense of sexual battery by an authority figure. Whether the trial court properly instructed the jury on a certain offense as a lesser-included offense of the charged offense is a mixed question of law and fact. State v. Rush, 50 S.W.3d 424, 427 (Tenn. 2001). Accordingly, the standard of review is de novo with no presumption of correctness. Id.

As a preliminary matter, the State contends that the Defendant waived this issue by not raising it before the Court of Criminal Appeals or in his brief requesting permission to appeal. The Defendant addressed the propriety of the attempt jury instruction within his argument challenging the sufficiency of the evidence in his appellate brief before the Court of Criminal Appeals and his brief submitted with his application pursuant to Rule 11 of the Tennessee Rules of Appellate Procedure. Within that argument, he addressed relevant case law and cited to the record. Accordingly, the Defendant sufficiently raised this issue at both levels to allow this Court's review of the issue. See Hodge v. Craig, 382 S.W.3d 325, 333-37 (Tenn. 2012) (recognizing that failing to list an issue in the appropriate section of the appellate brief may result in waiver); Ramirez v. Bridgestone/Firestone, Inc., 414 S.W.3d

707, 716 (Tenn. Ct. App. 2013) (providing that it was within discretion of the court to consider an issue "not listed as such under an appropriate heading in the brief").

Having determined that the issue is properly before this Court, we may consider the merits of this issue. "It is well-settled that a defendant has a constitutional right to a complete and correct charge of the law, so that each issue of fact raised by the evidence will be submitted to the jury on proper instructions." State v. Dorantes, 331 S.W.3d 370, 390 (Tenn. 2011). This "includes the right to jury instructions on each and every lesser-included offense embraced within the charged offense(s) and supported by the proof." State v. Davis, 266 S.W.3d 896, 902 (Tenn. 2008).

In State v. Burns, 6 S.W.3d 453, 466-69 (Tenn. 1999), this Court set out a framework for determining whether an offense should be included as a lesser-included offense in a particular case. First, the Court provided a test for courts to determine whether an offense, in general, qualifies as a lesser-included offense of the charged offense. Under this test, "[i]f a lesser offense is not included in the offense charged, then an instruction should not be given, regardless of whether evidence supports it." Id. at 467. If the offense qualifies as a lesser-included offense according to the inquiry above, the trial court still must determine whether the evidence in the particular case merits a jury instruction for that lesser-included offense. Id.

The first prong articulated in Burns was codified in large part in 2009 by our legislature as follows:

An offense is a lesser[-]included offense if:

(1) All of its statutory elements are included within the statutory elements of the offense charged;

(2) The offense is facilitation of the offense charged or of an offense that otherwise meets the definition of lesser[-]included offense in subdivision (f)(1);

(3) The offense is attempt to commit the offense charged or of an offense that otherwise meets the definition of lesser[-]included offense in subdivision (f)(1); or

(4) The offense is solicitation to commit the offense charged or of an offense that otherwise meets the definition of lesser[-]included offense in subdivision (f)(1).

Tenn. Code Ann. § 40-18-110(f) (Supp. 2010).

Applying the first prong of the analysis to the present case, we note that the statute specifically provides for attempt of the charged offense as a lesser-included offense of the charged offense. See id. § 40-18-110(f)(3) ("An offense is a lesser[-]included offense if . . . [t]he offense is attempt to commit the offense charged[.]"). Thus, the lesser-included offense in this case satisfies the first prong of our analysis, and we can turn to the second prong.

With respect to the second prong, the legislature adopted a provision similar to the one articulated in Burns for determining whether the evidence in the particular case merits a jury instruction for that lesser-included offense:

> When requested by a party in writing prior to the trial judge's instructions to the jury in a criminal case, the trial judge shall instruct the jury as to the law of each offense specifically identified in the request that is a lesser[-]included offense of the offense charged in the indictment or presentment. However, the trial judge shall not instruct the jury as to any lesser[-]included offense unless the judge determines that the record contains any evidence which reasonable minds could accept as to the lesser[-]included offense. In making this determination, the trial judge shall view the evidence liberally in the light most favorable to the existence of the lesser[-]included offense without making any judgment on the credibility of such evidence. The trial judge shall also determine whether the evidence, viewed in this light, is legally sufficient to support a conviction for the lesser[-]included offense.

Tenn. Code Ann. § 40-18-110(a); see also Burns, 6 S.W.3d at 469.

The Defendant cites to State v. Ely, 48 S.W.3d 710 (Tenn. 2001), to support his contention that criminal attempt should not be included as a lesser-included offense when the evidence supports the completed act. We note that, in Ely, this Court stated that the express inclusion in Burns of attempt and solicitation as lesser-included offenses "was meant to apply to situations in which a defendant attempts to commit, or solicits another to commit, either the crime charged or a lesser-included offense, but no proof exists of the completion of the crime." 48 S.W.3d at 719. However, attempt and solicitation were not at issue as lesser-included offenses in that case. See id. Thus, we do not construe this statement of dicta as a requirement that, in order to charge attempt as a lesser-included offense, the evidence must lack proof of the completed primary offense.

There are several situations in which Tennessee courts have held that the omission of an attempt instruction did not constitute reversible error. See, e.g., State v. Marcum, 109 S.W.3d 300, 304 (Tenn. 2003); State v. Biggs, 218 S.W.3d 643, 658 (Tenn. Crim. App. 2006); State v. Walters, No. M2003-03019-CCA-R3-CD, 2004 WL 2726034, at *9 (Tenn. Crim. App. Nov. 30, 2004), perm. app. denied (Tenn. Mar. 21, 2005). However, in those cases, the Defendant was challenging the *omission* of the attempt instruction, rather than the *inclusion* of the instruction. See Marcum, 109 S.W.3d at 301; Walters, 2004 WL 2726034, at *8.[3] Thus, because the instant case concerns a challenge to the *inclusion* of the attempt instruction, rather than the *omission* of the instruction, we conclude that these cases are not controlling.

The Defendant also relies on State v. Edwards, No. E2010-01731-CCA-R3-CD, 2012 WL 1799025 (Tenn. Crim. App. May 18, 2012), to support his assertion that an attempt instruction was not proper in this case. In Edwards, the victim testified that the defendant had lain down with her and rubbed her breast, her vagina, and her "bottom." Id. at *2. The defendant testified that he had not touched the victim inappropriately. Id. at *7-8. The trial court instructed the jury on the lesser-included offense of criminal attempt, and the jury convicted the defendant of this lesser crime. Id. at *1. The defendant contended on appeal that the evidence was not sufficient to support his conviction. Id. Relying on Marcum and Biggs, our Court of Criminal Appeals concluded that the trial court erred in instructing the jury on criminal attempt because "[t]he evidence at trial presented only two possible interpretations of the facts – that the defendant either completed the offense of aggravated sexual battery or he did not." Id. at *10. The Edwards panel reasoned that "[t]he evidence did not justify a jury charge on attempt because there was no evidence which reasonable minds could have accepted as to the lesser-included offense." Id. The court then determined that the evidence was not sufficient to support the defendant's conviction of criminal attempt to commit aggravated sexual battery, noting that "there was no evidence the [d]efendant tried and failed to complete the crime." Id. The court reasoned that, "by acquitting him of the

---

[3] In Marcum, 109 S.W.3d at 303, this Court considered whether an attempt instruction was "warranted" within the following context:

> The testimony in this case was susceptible of only two interpretations - that the rape occurred or that it did not. The victim's testimony that the defendant forced her to place her mouth "on" his "private part" is evidence that she engaged in fellatio and, therefore, supports a rape instruction. The defendant testified that this event never happened and, further, that he was never left alone with the victim at all. There was no evidence of attempt, and the jury found [the victim] a more credible witness. Thus, no instruction on attempt was warranted.

In retrospect, use of the term "warranted" was problematic, given that the context was whether the trial court had erred in excluding attempted rape as a lesser-included offense of the charged offense, rape. See id.

-11-

aggravated sexual battery charge the jury rejected [the victim's] testimony that the [d]efendant repeatedly touched her breasts, buttocks, and vagina." Id. at *11. The Edwards panel continued:

> Even viewing the remaining evidence in the light most favorable to the State and assuming that the jury accepted [the victim's] testimony that the Defendant repeatedly lay underneath the covers with her, we cannot conclude that the evidence was sufficient to establish attempted aggravated sexual battery. To establish that the Defendant's conduct constituted a substantial step the State had to show that the Defendant's "entire course of action [was] corroborative of [his] intent to" intentionally touch the victim's intimate parts or the clothing immediately covering her intimate parts for the purpose of sexual arousal or gratification. . . . Because the jury rejected [the victim's] testimony that the Defendant actually touched her "intimate parts," we conclude that there was no remaining evidence in the record that proved the Defendant had the intent to commit aggravated sexual battery and that he took a substantial step toward the completion of that offense.

Id.

In our view, the Court of Criminal Appeals' analysis in Edwards was tantamount to a holding that the offense of criminal attempt includes *as an element* that the offense attempted was not completed. The Edwards decision is not the first time this proposition has been asserted. In 1970, long before the adoption of our current criminal code, the Court of Criminal Appeals stated that "[t]he gravamen of an [a]ttempt would be the lack of consummation of the act." Levasseur v. State, 464 S.W.2d 315, 319 (Tenn. Crim. App. 1970); see also State v. Jackson, 697 S.W.2d 366, 371 (Tenn. Crim. App. 1985) (stating that "one of the elements of an attempt is the failure to consummate the crime"). Our Court of Criminal Appeals has repeated this proposition since the adoption of our current criminal statutes. See, e.g., State v. Grainger, No. M2001-02178-CCA-R3-CD, 2002 WL 31385936, at *5 (Tenn. Crim. App. Oct. 22, 2002), perm. app. denied (Tenn. Mar. 3, 2003) ("An 'attempt' necessarily means that the offense was not completed."); State v. Horn, No. M2002-00903-CCA-R3-CD, 2003 WL 21673668, at *6 (Tenn. Crim. App. July 17, 2003), perm. app. denied (Tenn. Oct. 6, 2003). However, this Court has made clear that "the criminal attempt statute requires that the State prove *two* material elements: the culpability required for the attempted crime; and an act or acts in furtherance of the attempted crime." Wyatt v. State, 24 S.W.3d 319, 323 (Tenn. 2000) (emphasis added). Proof that the defendant failed to complete the crime is not an element of the offense of criminal attempt.

Additionally, we also agree with the Court of Criminal Appeals' analysis in this case that the Edwards panel failed to examine "the evidence liberally in the light most favorable to the existence of the lesser[-]included offense." Thorpe, 2013 WL 5436701, at *6 (quoting Tenn. Code Ann. § 40-18-110(a)). Rather, the Edwards panel considered the implications of the jury's fully accrediting the victim or fully accrediting the defendant, finding that neither would have resulted in an attempt conviction. Edwards, 2012 WL 1799025, at *11. However, as the Court of Criminal Appeals has recognized, "[t]he all or nothing dichotomy set up by the [Edwards] panel was not the only available interpretation of the facts open to the jury, who saw and heard the witnesses first hand." Thorpe, 2013 WL 5436701, at *6.

Thus, a jury is free to accredit portions of the victim's testimony such that the evidence might establish "a substantial step toward the commission of the offense" and not the completed offense. See Tenn. Code Ann. § 39-12-101(a)(3). This Court has stated that, "[b]ecause our constitution invests the jury with the power to determine both the 'law and the facts,' the jury is free to reject any evidence offered by the State, no matter how uncontroverted or uncontested a particular fact or element may appear." State v. Richmond, 90 S.W.3d 648, 660 (Tenn. 2002) (quoting Tenn. Const. art. I, § 19).

Moreover, as the jury was instructed in this case, our pattern jury instructions include the following jury charge:

> In forming your opinion as to the credibility of a witness, you may look to the proof, if any, of his or her general character, the evidence, if any, of the witness' reputation for truth and veracity, the intelligence and respectability of the witness, his or her interest or lack of interest in the outcome of the trial, his or her feelings, his or her apparent fairness or bias, his or her means of knowledge, the reasonableness of his or her statements, his or her appearance and demeanor while testifying, his or her contradictory statements as to material matters, if any are shown, and all the evidence in the case tending to corroborate or to contradict him or her.

T.P.I. – Crim. 42.04 (17th ed. 2013). Alternatively, a jury may be instructed as follows: "You must decide which witnesses you believe and how important you think their testimony is. You do not have to accept or reject everything a witness said. You are free to believe all, none, or part of any person's testimony." T.P.I. – Crim. 42.04(a).

In light of our legislature's specific provision that "it is no defense to prosecution for criminal attempt that the offense attempted was actually committed," Tenn. Code Ann. § 39-12-101(c), we hold that proof, even uncontroverted proof, that a defendant completed a crime, in and of itself, does not shield a defendant from a conviction for criminal attempt of

the crime allegedly completed. Moreover, the State need not adduce proof in a prosecution for criminal attempt that the defendant failed to complete the target crime. Proof sufficient to support a defendant's conviction of sexual battery is, logically and legally, sufficient to support that defendant's conviction of criminal attempt to commit sexual battery.

Therefore, we hold that criminal attempt is available as a lesser-included offense of any charged offense in every case in which: (1) the charged offense has a requisite intent element; and (2) the proof has fairly raised the completed offense.[4] In the instant case, the charged offense was sexual battery by an authority figure. This charged offense has a requisite intent element as required by the first prong of this test. Likewise, the proof fairly raised the issue of the charged offense for purposes of inclusion of the jury instruction on the charged offense as required by the second prong of the test. Indeed, the Defendant does not challenge this point. Accordingly, we conclude that the trial court did not err by including the attempt charge in its jury instruction.[5]

*Sufficiency of the Evidence*

We next must determine whether the evidence is legally sufficient to support a conviction for criminal attempt to commit sexual battery by an authority figure. Our standard of review regarding sufficiency of the evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also Tenn. R. App. P. 13(e). After a jury finds a defendant guilty, the presumption of innocence is removed and replaced with a presumption of guilt. State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992). Consequently, the defendant has the burden on appeal of demonstrating why the evidence was insufficient to support the jury's verdict. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

The appellate court does not weigh the evidence anew. Rather, "a jury verdict, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts" in the testimony and all reasonably drawn inferences in favor of the State. State v. Harris, 839 S.W.2d 54, 75 (Tenn. 1992). Thus, "the State is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom." Id. (citation omitted). This standard of review applies to guilty verdicts

---

[4] We emphasize that our holding today should not be interpreted as holding that a court's *failure* to give a lesser-included offense instruction on criminal attempt, even when such an instruction would be proper, necessarily constitutes reversible error.

[5] We expressly overrule State v. Edwards, No. E2010-01731-CCA-R3-CD, 2012 WL 1799025 (Tenn. Crim. App. May 18, 2012), to the extent that it conflicts with this holding.

based upon direct or circumstantial evidence. Dorantes, 331 S.W.3d at 379 (citing State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)). In Dorantes, this Court adopted the United States Supreme Court standard that "direct and circumstantial evidence should be treated the same when weighing the sufficiency of such evidence." Id. at 381. Accordingly, the evidence need not exclude every other reasonable hypothesis except that of the defendant's guilt, provided the defendant's guilt is established beyond a reasonable doubt. Id.

The weight and credibility given to the testimony of witnesses, and the reconciliation of conflicts in that testimony, are questions of fact for the jury. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). Furthermore, it is not the role of this Court to reevaluate the evidence or substitute its own inferences for those drawn by the jury. State v. Lewter, 313 S.W.3d 745, 748 (Tenn. 2010) (citation omitted).

As charged in this case, sexual contact by an authority figure is defined as "unlawful sexual contact with a victim by the defendant or the defendant by a victim" when "the victim was, at the time of the offense, thirteen (13) years of age or older but less then [sic] eighteen (18) years of age." Tenn. Code Ann. § 39-13-527(a)(1) (2010). For the defendant to be considered an "authority figure," the defendant must have been "in a position of trust, or had supervisory or disciplinary power over the victim by virtue of the defendant's legal, professional or occupational status" or "had, at the time of the offense, parental or custodial authority over the victim." Id. § 39-13-527(a)(3). Sexual contact is defined as

> includ[ing] the intentional touching of the victim's, the defendant's, or any other person's intimate parts, or the intentional touching of the clothing covering the immediate area of the victim's, the defendant's, or any other person's intimate parts, if that intentional touching can be reasonably construed as being for the purpose of sexual arousal or gratification.

Tenn. Code Ann. § 39-13-501(6) (2010). Additionally, "[i]ntimate parts" is defined as "includ[ing] semen, vaginal fluid, the primary genital area, groin, inner thigh, buttock or breast of a human being." Id. § 39-13-501(2).

Thus, to obtain a conviction for criminal attempt to commit sexual battery by an authority figure, as applicable here, the State must prove that the Defendant acted with the intent to commit sexual battery by an authority figure and that his "conduct constitute[d] a substantial step toward the commission of the offense." Tenn. Code Ann. § 39-12-101(a)(3). Moreover, as we emphasized above, "[i]t is no defense to prosecution for criminal attempt that the offense attempted was actually committed." Id. § 39-12-101(c).

Here, the evidence presented at trial clearly was sufficient to support the Defendant's conviction for criminal attempt to commit sexual battery by an authority figure. The victim testified that on Friday, August 27, 2010, while Mother was at work, the victim received a text message from the Defendant asking her what she was wearing. She subsequently received another text message from the Defendant that stated, "I want to kiss on them thighs when I get back." The victim confirmed that the Defendant had said something similar to this in the past. The victim's response to this text message was "[O]kay," but she expressed at trial her concern that, had she rejected him, he would have taken away more of her belongings or torn her "down verbally." Shortly thereafter, she received another text message from the Defendant that stated, "Go put on some shorts," to which she again responded, "[O]kay." The Defendant later sent a text message that stated, "Easier to get to things that way."

When the Defendant returned home that evening, the victim had not yet changed into shorts and instead was wearing sweat pants. According to the victim, the Defendant became angry, yelling at the victim to go change and accusing her of making "everything so difficult." As a result, the victim changed into shorts, and the Defendant "came into [her] room and he kissed . . . [her] inner thighs." She explained that his hands were holding her outer thighs and that he kissed up to her bikini line. The victim cried while the Defendant kissed her. After he finished, he told her, "I know it hurt you but it's okay."

Detective Weaver with the MNPD identified at trial fourteen pages of screen shots containing text messages from the victim's cell phone, which confirmed the victim's testimony in this regard. These text messages included the following messages to the victim from the Defendant: "What do you have on"; "I wanna kiss on them thighs when I get back"; "You gonna put on some shorts"; and "Easier to get to them that way."

This proof established that the Defendant intended to commit a sexual battery upon the victim and that he took substantial steps toward that end, including: sending text messages to the victim telling her to change her clothes to make it easier for him to access her intimate parts; sending text messages to the victim about what he intended to do; and kissing her on the inside of her legs. Moreover, the proof showing that the Defendant had lived with the victim's family for almost two years and was responsible for disciplining the victim and Brother while Mother was at work supported the jury's determination that the Defendant was an authority figure.

Thus, viewing the evidence with the strongest legitimate view in favor of the State, see Harris, 839 S.W.2d at 75, we hold that the evidence at trial was sufficient for a jury to convict the Defendant of criminal attempt to commit sexual battery by an authority figure. Accordingly, the Defendant is entitled to no relief on this issue.

-16-

**CONCLUSION**

For the reasons set forth above, we affirm the Defendant's conviction for criminal attempt to commit sexual battery by an authority figure. Because the Defendant is indigent, costs are assessed to the State of Tennessee.

_____
JEFFREY S. BIVINS, JUSTICE