IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs December 10, 2024

## JAMIE P. DENNIS v. STATE OF TENNESSEE

**Appeal from the Circuit Court for Stewart County
No. 2018-CR-4    Larry J. Wallace, Judge**

—————————————

**No. M2024-00670-CCA-R3-PC**

—————————————

The Petitioner, Jamie P. Dennis, appeals from the denial of his petition for post-conviction relief, wherein he challenged his convictions for attempted rape of a child and attempted incest. On appeal, he argues that the post-conviction court erred in finding that the Petitioner's trial counsel and appellate counsel provided him with effective assistance of counsel. The Petitioner bases his ineffectiveness claims on trial counsel's failure to present a specific defense related to criminal attempt as a lesser included offense, failure to request reclassification of his prior conviction offenses to establish the appropriate sentencing range, and appellate counsel's failure to raise the same issues on direct appeal. After review, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

KYLE A. HIXSON, J., delivered the opinion of the court, in which TIMOTHY L. EASTER and TOM GREENHOLTZ, JJ., joined.

Will Riggins, Dover, Tennessee, for the appellant, Jamie P. Dennis.

Jonathan Skrmetti, Attorney General and Reporter; Brooke A. Huppenthal, Assistant Attorney General; W. Ray Crouch, Jr., District Attorney General; and Erin D. Bryson, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### I.    FACTUAL AND PROCEDURAL HISTORY

A.     Trial, Sentencing, and Direct Appeal Proceedings[1]

The Petitioner was charged with one count of rape of a child, four counts of rape, and five counts of incest corresponding to the rapes based upon alleged sexual abuse of his biological daughter between November 2016 and April 2017. *See State v. Dennis*, No. M2018-01894-CCA-R3-CD, 2021 WL 1227801, at *1 (Tenn. Crim. App. Mar. 31, 2021), *perm. app. denied* (Tenn. Aug. 4, 2021). On direct appeal, this court summarized the proof introduced at trial as follows:

Tina Neil, the [Petitioner]'s mother, testified that the [Petitioner] is the victim's father. Throughout the early years of the victim's life, the victim lived with various family members and foster families before the [Petitioner] obtained custody of her following his release from prison stemming from other crimes.

Ms. Neil recalled that there came a time when she observed that the victim "was just always hanging on [the Petitioner], . . . [j]ust touching him[,]" or sitting on his lap. She felt that it was not appropriate behavior in public and asked the [Petitioner] not to have the victim sit on his lap at the restaurant she owned. The victim began living with Ms. Neil about a year and a half before the trial, and shortly after the victim moved in with her, the victim made a disclosure that prompted Ms. Neil to contact the sheriff's department. When asked about whether the victim was honest, Ms. Neil said that she presently felt that the victim was honest but that the victim had been less honest when she was younger "[l]ike most children."

The victim testified that she was fourteen years old at the time of trial and had met the [Petitioner], her father, when she was eleven or twelve years old at the end of sixth grade in 2016. She lived with her maternal grandfather prior to meeting and moving in with the [Petitioner]. She recalled that she lived in three different residences with the [Petitioner]—"[f]irst at Rebecca's house and then across from Lance[']s and then in Big Rock." The events at issue occurred when they lived in the latter two residences.

The victim recalled that the residence across from Lance's was a house trailer in which the [Petitioner]'s girlfriend, Chasity, also lived with

[1] To assist in the resolution of these proceedings, we take judicial notice of the record from the Petitioner's direct appeal. *See* Tenn. R. App. P. 13(c)*; e.g., Harris v. State,* 301 S.W.3d 141, 147 n.4 (Tenn. 2010) (noting that an appellate court may take judicial notice of its own records).

them. The [Petitioner]'s father resided with them at times as well. The victim had her own bedroom there. The victim felt that her relationship with the [Petitioner] was a normal father-daughter relationship at first, but then "[t]hings started acting different as if like I was his girlfriend or something" and progressed into a sexual relationship.

The victim recalled that she was twelve years old when the [Petitioner] first had sex with her. She said that it occurred when they lived in the trailer across from Lance's between 5:00 and 6:30 a.m. when he woke her up to get ready for school. She remembered that it was on a Wednesday after Thanksgiving but before her thirteenth birthday on December 7, 2016. She recalled that it was still dark but not so dark that she could not see, and the [Petitioner] began hugging and kissing her before removing her shorts and underwear. She tried to move away, but the [Petitioner] "kept doing what he was doing." He touched her private areas, both outside and inside her body. The [Petitioner] touched her for a few minutes before he inserted his penis into her vagina. She could not tell whether the [Petitioner] ejaculated. She said that Chasity, the [Petitioner]'s girlfriend, was in the room she and the [Petitioner] shared, likely asleep. The victim stated that she felt "[d]ifferent" after the first rape, "[l]ike, everything changed." She recalled that the intercourse was painful and that she did not want to have sex with the [Petitioner]. Her private areas hurt for a couple hours afterwards.

The victim testified that the [Petitioner] had sex with her often, estimating that it happened ten to twenty times a month, always in the morning before school. Asked if she consented to the subsequent sexual encounters, the victim responded, "[y]es and no," elaborating that she consented "[o]nly to keep peace and keep everything from being a disaster or yelling or throwing or anything." She said that the [Petitioner] did not threaten her, but she was afraid of what might happen.

The victim testified that she was not on birth control at the time of the first sexual encounter, but she started taking it the following February at the [Petitioner]'s direction because he began ejaculating inside of her instead of withdrawing as he had previously done. She knew that the [Petitioner] ejaculated inside of her because he told her that he did, and she saw semen on her private areas. The [Petitioner] instructed her to clean herself afterwards, and he never wore a condom. The victim recalled that the

[Petitioner] instructed her not to tell anyone about the abuse the "very first couple times."

The victim then identified several Facebook messages sent between the [Petitioner] and herself, which were entered as exhibits at trial. In one message, the [Petitioner] wrote, "I'm not making you feel uncomfortable sitting on me like this, am I," and the victim responded, "No." The [Petitioner] wrote, "Okay, good. You promise," and the victim said, "yeah." The victim recalled that her relationship with the [Petitioner] became almost like that of a girlfriend and that some of the messages were more of a "girlfriend" in nature. She said that her contact name was listed as "Daddy's Baby" in the [Petitioner]'s phone and that he often called her that. The victim also identified a picture of herself that she sent to the [Petitioner] at his request.

In another message, the [Petitioner] wrote, "Did I love on you too much," and the victim said, "No." He then asked, "I didn't make you feel uncomfortable," and the victim responded, "No." The [Petitioner] then said, "Okay. If I ever do, you tell me, okay. I just love you[.]" In another message, the [Petitioner] wrote, "What made you kiss me[?]" The victim explained that the [Petitioner] had asked her to kiss him on the lips, which she did not want to do at first but eventually complied. The victim confirmed that the [Petitioner] sent the message about the kiss after she had kissed him on the lips.

In another exchange, the [Petitioner] wrote, "Why would you ask me that?" The victim responded, "Because today while you . . . and Chasity was together, I saw you sucking the lips off her I just wanted to know." The [Petitioner] responded, "It's okay, Baby. That's part of it, but you will always be first in my life." The victim replied, "Not always, and it's not like you should be sucking the lips off of her either. It's nasty seeing all that. Yuck." The [Petitioner] responded, "Well, you kissed me, and I loved it too." The victim replied, "Yeah. I know, but I did that so you know that I will kiss you and . . . I love you."

In another message, the [Petitioner] wrote, "If you don't like giving me a kiss, I will understand." The victim wrote a message saying, "I do love you, but this calling you daddy isn't as easy as kissing you." On another occasion, the victim sent another picture of herself to the [Petitioner] at his

request, and the [Petitioner] wrote, "You're mine," and the victim replied, "I'm talking to a bunch of guys and you're one of them," and the [Petitioner] said, "I better be your only one[.]"

In another message, the [Petitioner] wrote, "I need a pic, baby," and after the victim sent him one, he wrote, "You going to give me a bunch of loving and kisses when you get here," to which the victim responded, "Yeah." In another exchange, the [Petitioner] wrote, "Kisses, kisses, kiss, kiss, kiss, kiss, kiss, kiss," and the victim said, "Thanks." The [Petitioner] wrote, "I need kisses, not on the cheek either[,]" and the victim replied, "Kiss, kiss, kiss, kiss, kiss, kiss, kiss, kiss, kiss on the lips." The [Petitioner] then wrote, "Oh, yeah. Thank you, my baby," and the victim responded, "Is that good[?]" The [Petitioner] replied, "Always. No more kisses on the cheek, okay. And no more dry kisses. Lick your lips first[,]" and the victim replied, "Whatever." The [Petitioner] said, "Please[,]" and the victim responded, "I give you kisses however I give them." The [Petitioner] then wrote, "Okay, baby. But please, you're mine, so lips only, okay?" The victim responded, "Okay. Okay. I love you[,]" and the [Petitioner] wrote, "I love you too."

The victim confirmed that she wrote out a statement about what had happened between her and the [Petitioner]. Although she did not recall at the time of trial, she acknowledged that she had written in her statement that at one point the [Petitioner] had asked her to suck his penis and she refused.

Sheriff Deryk Wyatt, with the Stewart County Sheriff's Office, testified that he took over the investigation in the case after the initial investigator resigned from the sheriff's office. Sheriff Wyatt interviewed the victim to establish a timeline for the allegations, but a physical examination was not performed on her because the lapse in time between the sexual abuse and disclosure to law enforcement made the possibility of finding DNA or physical trauma very slim. Sheriff Wyatt said that the initial investigator interviewed the [Petitioner], and that he had reviewed the recording of the interview.

At trial, the thirty-eight-year-old [Petitioner] acknowledged that he had prior convictions for forgery, burglary, vandalism, filing a false report, and theft. He served time in prison, but after he was released sought to obtain custody of the victim, who was living with her grandfather at the time. He eventually obtained full custody of her in 2016. He said that it was hard to

- 5 -

make up for the lost time, and it took the victim a while to call him "dad" rather than "father." When he first obtained custody of the victim, he was living in a trailer park across the road from Lance's in Stewart County with his wife, Chasity Dennis. Ms. Dennis's other children stayed with them on the weekends. The [Petitioner]'s father lived with them as well.

The [Petitioner] recalled that for six or seven months around the timeframe of the allegations, he worked at a job in Fort Campbell and had to leave his house at 3:30 a.m. His wife and father would be at home with the victim after he had gone to work. He then took employment with a tree company in town for which he had to leave around 5:30 a.m. to go to work. The [Petitioner] said that he and his wife alternated waking up the victim for school and that his wife was "[a]lways" awake regardless of who awakened the victim.

The [Petitioner] denied raping the victim. He claimed that the text messages saying "[k]iss, kiss, kiss, kiss, kiss" that he sent to the victim were "just something that was between father and daughter . . . there's nothing ever meant by it." He said the texts did not mean anything sexual. Contrary to his mother's testimony, the [Petitioner] claimed that the victim never sat on his lap at his mother's restaurant. The [Petitioner] denied that he had ever threatened to "whip" the victim.

The [Petitioner] testified that he disciplined the victim for inappropriate conduct on social media by taking away her phone, which angered the victim. They argued about it daily. The victim's grades began to fall, so the [Petitioner] enrolled her in tutoring. The [Petitioner] said that the victim never told him that someone else had sexually abused her.

The [Petitioner] recalled that the victim stayed with his mother out of state for two weeks over spring break and then again for the entire summer break. In June of 2017, the victim called to wish him a happy Father's Day and apologize for being away. During the conversation, the [Petitioner] asked the victim for the password to her computer because he had found letters that she had written to her boyfriend, and he "wanted to further investigate in her computer." The victim refused to give him the password.

The [Petitioner] said that he fully cooperated with the investigation and that he had no idea why the victim would make such allegations against him.

*Dennis*, 2021 WL 1227801, at *1-4 (footnote omitted). Following the conclusion of the proof, the Petitioner was convicted of the lesser included offense of attempted rape of a child in count 1, a Class B felony, and the lesser included offense of attempted incest in corresponding count 6, a Class D felony; he was acquitted of the remaining charges. *Id.* at *1.

At the Petitioner's sentencing hearing on October 1, 2018, the parties agreed that his past felony convictions established him as a Range III, persistent offender for count 1 and as a career offender for count 6. The record reflects that the Petitioner had the following prior felony convictions: an out-of-state conviction for flagrant nonsupport committed in 2003, for which he received a five-year sentence[2]; aggravated burglary, a Class C felony, committed in 2004; burglary ($1,000 - $10,000), a Class D felony, committed in 2006; vandalism ($1,000 - $10,000), a Class D felony, committed in 2006; false report, a Class D felony, committed in 2011; theft ($1,000 - $10,000), a Class D felony, committed in 2012; four separate convictions for forgery, a Class E felony, committed in 2004; forgery, a Class E felony, committed in 2005; and forgery, a Class E felony, committed in 2012. The Petitioner received an effective sentence of forty years' incarceration, with the first twenty-eight years at a forty-five percent service rate and twelve years at a sixty percent service rate.

On direct appeal, the Petitioner challenged the sufficiency of the evidence and the failure of the trial court to provide a modified unanimity instruction after the State did not make an election of offenses. *Dennis*, 2021 WL 1227801, at *1. This court affirmed the Petitioner's convictions. *Id*.

The Petitioner filed a timely petition for post-conviction relief.

## B. Post-Conviction Proceedings

In his amended petition filed with the assistance of post-conviction counsel, the Petitioner claimed that both his trial counsel and appellate counsel were constitutionally ineffective. Specifically, he alleges that,

---

[2] The parties at the sentencing hearing seemed to agree that the out-of-state conviction would have been a Class C felony in Tennessee. We take no position as to whether the parties were correct on this point, as it is not necessary to our disposition.

1. Trial counsel failed to challenge the sufficiency of the evidence necessary to meet the substantial step test for the requisite elements of the lesser included offenses of attempt he was convicted of at trial. The Petitioner contends that trial counsel had a constitutional obligation to prepare and present a specific defense at trial against lesser included offenses, rather than only against the principal offenses;

2. Trial counsel failed to object at sentencing to his classification as a Range III persistent offender for his conviction of attempted rape of a child. The Petitioner contends that the criminal savings statute, coupled with the 2017 statutory changes to the gradation of offenses based upon value, should have operated to reduce his prior theft and vandalism convictions to a lower class of offense, thereby eliminating their use to establish the appropriate range for this offense; and,

3. Appellate counsel failed to raise either issue on direct appeal.

The Petitioner called trial and appellate counsel to testify at the post-conviction hearing.

Trial counsel testified that she had been practicing law for over thirty years and represented the Petitioner at trial and through sentencing.[3] She confirmed that she did not object to the inclusion of attempt as lesser included offenses in the jury charge, "because that's a fairly standard practice." Additionally, she did not focus on specifically defending against the lesser included offenses because the defense's theory was that the Petitioner was not guilty of the charged offenses, and this was the focus of her closing argument. She further testified that she "poured more hours into [the Petitioner's] case" than many similarly situated cases she had worked on and that she was "very prepared" at trial.

Trial counsel also stated that she had reviewed the Petitioner's prior convictions before he was sentenced, and although she was then unaware of the 2017 statutory changes made regarding the classification of theft offenses, to her understanding, the law did not operate to change past convictions such that the Petitioner's sentencing range would have been affected in this case. Trial counsel ultimately asserted that, looking back, she would not have done anything differently in her defense of the Petitioner at trial—which resulted in the acquittal of all offenses as charged and only two convictions, out of a possible ten,

---

[3] The record in the underlying case indicates that counsel also represented the Petitioner at the hearing on his motion for new trial, but this fact was not discussed at the hearing on the petition.

for lesser included offenses—or at sentencing. She explained that she "[did not] recall any objections that [she] could have made" as to the Petitioner's sentencing.

Appellate counsel testified that he had been practicing law for nearly twenty-five years and represented the Petitioner on direct appeal. Upon his review of the case, appellate counsel stated that he "thought that the trial was relatively clean." On appeal, he did not raise any issue regarding the inclusion of attempt as lesser included offenses in the jury instructions because he "did not have any reason to dispute [that]." Appellate counsel explained that "[g]enerally, an attempt is usually a win in a case where there is a very serious case," and it would be "rare" to argue against its inclusion because of the "potential exposure" for the jury to then find the defendant guilty of the more serious charged offenses. In his opinion, eliminating attempt as lesser included offenses in this case could have "absolutely" resulted in a worse outcome for the Petitioner.

As to the sentencing range issue, appellate counsel confirmed that he was not aware of "any legal argument, case law, [or] statute that would retroactively reach back and change existing convictions." He further asserted that the "rules of ethics" would prevent him from raising or arguing such a claim, stating that, "We can't generally . . . perpetrate on the court something that is just . . . without any basis."

The post-conviction court issued a written order denying the petition. In its findings of fact and conclusions of law, the post-conviction court found that the Petitioner failed to carry his burden of proof as to both deficient performance and prejudice. The post-conviction court found that trial counsel's testimony was "essentially unrefuted" regarding the strategic decisions she made at trial and sentencing, noting that the Petitioner avoided a potentially worse outcome. Further, the post-conviction court noted that appellate counsel's testimony established that the claims the Petitioner asserts should have been raised on direct appeal were not "worth arguing" in appellate counsel's professional opinion. Ultimately, the post-conviction court found that none of the Petitioner's claims were meritorious and denied relief.

The Petitioner filed a timely notice of appeal.

## II.    ANALYSIS

In this appeal, the Petitioner asserts that the post-conviction court erred by denying his claim that he received ineffective assistance of counsel at trial and on direct appeal. His specific contentions are that trial counsel was ineffective because she (1) failed to present arguments at trial that the Petitioner did not meet the substantial step test requirement to be

found guilty of attempt of the charged offenses, and (2) failed to object to his classification as a Range III, persistent offender as to count 1, in that she should have argued that the criminal savings statute and statutory changes in the gradation of theft offenses would have operated to lower the classes of his prior felony convictions. The Petitioner likewise contends that appellate counsel was ineffective because he failed to raise either of these issues on direct appeal. The Petitioner argues that counsels' failings entitle him to post-conviction relief, contrary to the post-conviction court's ruling.

Post-conviction relief is available when a "conviction or sentence is void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." Tenn. Code Ann. § 40-30-103. The burden in a post-conviction proceeding is on the petitioner to prove allegations of fact by clear and convincing evidence. *Id.* § -110(f); *see Dellinger v. State*, 279 S.W.3d 282, 293-94 (Tenn. 2009). "[Q]uestions concerning the credibility of the witnesses, the weight and value to be given their testimony, and the factual issues raised by the evidence are to be resolved" by the post-conviction court. *Fields v. State*, 40 S.W.3d 450, 456 (Tenn. 2001). On appeal, we are bound by the post-conviction court's findings of fact unless we conclude that the evidence in the record preponderates against those findings. *Id.* Because they relate to mixed questions of law and fact, the post-conviction court's conclusions as to whether counsel's performance was deficient and whether that deficiency was prejudicial are reviewed under a de novo standard with no presumption of correctness. *Id.* at 457.

Criminal defendants are constitutionally guaranteed the right to effective assistance of counsel. U.S. Const. amend. VI; Tenn. Const. art. I, § 9; *see Cuyler v. Sullivan*, 446 U.S. 335, 344 (1980); *Dellinger*, 279 S.W.3d at 293. When a claim of ineffective assistance of counsel is made under the Sixth Amendment to the United States Constitution, the burden is on the petitioner to show (1) that counsel's performance was deficient and (2) that the deficiency was prejudicial. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see Lockhart v. Fretwell*, 506 U.S. 364, 368-72 (1993). "Because a petitioner must establish both prongs of the test, a failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim." *Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996). The *Strickland* standard has been applied to the right to counsel under article I, section 9 of the Tennessee Constitution. *State v. Melson*, 772 S.W.2d 417, 419 n.2 (Tenn. 1989).

Deficient performance requires a showing that "counsel's representation fell below an objective standard of reasonableness," and reviewing courts "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional

assistance." *Strickland*, 466 U.S. at 688-89. When a court reviews a lawyer's performance, it "must make every effort to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's conduct, and to evaluate the conduct from the perspective of counsel at that time." *Howell v. State*, 185 S.W.3d 319, 326 (Tenn. 2006) (citing *Strickland*, 466 U.S. at 689). We will not deem counsel to have been ineffective merely because a different strategy or procedure might have produced a more favorable result. *Rhoden v. State*, 816 S.W.2d 56, 60 (Tenn. Crim. App. 1991). We recognize, however, that "deference to tactical choices only applies if the choices are informed ones based upon adequate preparation." *Cooper v. State*, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992) (citing *Hellard v. State*, 629 S.W.2d 4, 9 (Tenn. 1982)).

As to the prejudice prong, the petitioner must establish "a reasonable probability that[,] but for counsel's unprofessional errors[,] the result of the proceeding would have been different." *Vaughn v. State*, 202 S.W.3d 106, 116 (Tenn. 2006) (citing *Strickland*, 466 U.S. at 694). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. "That is, the petitioner must establish that his counsel's deficient performance was of such a degree that it deprived him of a fair trial and called into question the reliability of the outcome." *Pylant v. State*, 263 S.W.3d 854, 869 (Tenn. 2008) (citing *State v. Burns*, 6 S.W.3d 453, 463 (Tenn. 1999)).

## A. Lesser Included Offenses

The Petitioner argues that trial counsel should have "dissipate[d] substantial steps which led to the alleged princip[al]" offenses by presenting a specific defense against attempt to commit those offenses. The State responds that the Petitioner failed to establish both deficient performance and prejudice, as trial counsel made "informed, strategic decisions" that the Petitioner actually benefitted from by way of his acquittal of all of the charged offenses and conviction of only two lesser included offenses. We agree with the State.

The post-conviction court correctly ruled that the Petitioner failed to establish that trial counsel's performance regarding the lesser included offenses was deficient. Trial counsel indicated that she made decisions based on extensive preparation in the Petitioner's case and the legal knowledge and experience she had accumulated in thirty years of practice. The defense strategy at trial, an "all-or-nothing" approach to attacking the State's proof of the completed offenses, was ultimately successful in that it resulted in the Petitioner's acquittal of the bulk of the offenses—all, in fact, of the charged offenses. The post-conviction court credited trial counsel's testimony regarding the basis of her decision-making and further found that such decisions resulted in a better outcome for the

Petitioner at trial than the alternative. The record thus reflects that trial counsel's decision not to argue against lesser included offenses was a tactical and informed choice made after adequate preparation, which we will not second-guess on post-conviction review. *See Hellard*, 629 S.W.2d at 9. The Petitioner has failed to establish deficient performance.

Regarding prejudice, contrary to the Petitioner's assertion that "[n]ot only did the crime not occur, it could[ not] therefore have been attempted," at trial, "a jury is free to accredit portions of the victim's testimony such that the evidence might establish 'a substantial step toward the commission of the offense' and not the completed offense." *State v. Thorpe*, 463 S.W.3d 851, 863 (Tenn. 2015) (citing Tenn. Code Ann. § 39-12-101(a)(3) ("A person commits criminal attempt who, acting with the kind of culpability otherwise required for the offense . . . [a]cts with intent to complete a course of action or cause a result that would constitute the offense . . . and the conduct constitutes a substantial step toward the commission of the offense.")). Additionally, even if the Petitioner's trial counsel had made such an argument, the jury would still remain free to accredit "all, none, or part" of the actual testimony it heard. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997) ("Questions concerning the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact."). This does not weigh of favor of establishing "reasonable probability" that the result of the proceeding would have been different had trial counsel done as the Petitioner contends she should have. *Strickland*, 466 U.S. at 694. The Petitioner is not entitled to relief.

## B.      Sentencing Range

The Petitioner argues that trial counsel should have objected to his classification as a Range III, persistent offender as to count 1, and the basis for that objection should have included argument that his prior convictions would be reclassified based on subsequent changes in the law. The State responds that the trial court lacked jurisdiction to alter the offense classes of the Petitioner's prior convictions based upon final judgments having already been entered, and that trial counsel was not deficient for failing to raise this meritless issue.[4] We agree with the State.

"A persistent offender is a defendant who has received . . . any combination of five (5) or more prior felony convictions within the conviction class or higher or within the next

---

[4] Additionally, the State asserts that the Petitioner has waived this claim for failing to include the prior convictions at issue in the record on this appeal. As noted above, we take judicial notice of the record in the underlying case provided to this court on direct appeal, which remains accessible for our review.

two (2) lower felony classes[.]" Tenn. Code Ann. § 40-35-107(a)(1). The record reflects that, at the time he was sentenced in the underlying case, the Petitioner had one Class C felony conviction, four Class D felony convictions in Tennessee, and an additional out-of-state felony conviction. Accordingly, the trial court, in sentencing the Petitioner, determined that he had the appropriate number of convictions in the two lower felony classes to be considered a persistent offender for purposes of sentencing on his Class B felony conviction for attempted rape of a child.

The Petitioner's argument centers on two of his prior Class D felony convictions: theft ($1,000 - $10,000) in 2012 and vandalism ($1,000 - $10,000) in 2006. He contends that, based on the 2017 amendment to the gradation of theft offenses in Tennessee Code Annotated section 39-14-105 and the application of the criminal savings statute in Tennessee Code Annotated section 39-11-112, these two prior conviction offenses should have had their classifications reduced, precluding his consideration as a Range III, persistent offender in this case.

The Public Safety Act of 2016, effective January 1, 2017, modified the classification grading of theft in Tennessee Code Annotated section 39-14-105 as follows:

(a) Theft of property or services is:

(1) A Class A misdemeanor if the value of the property or services obtained is one thousand dollars ($1,000) or less;

(2) A Class E felony if the value of the property or services obtained is more than one thousand dollars ($1,000) but less than two thousand five hundred dollars ($2,500);

(3) A Class D felony if the value of the property or services obtained is two thousand five hundred dollars ($2,500) or more but less than ten thousand dollars ($10,000)[.]

2016 Tenn. Pub. Acts, ch. 906, § 5. The Petitioner's argument is that, based on this statutory change in grading such offenses having taken effect the year prior to his sentencing in the underlying case, his prior theft and vandalism convictions should have no longer been considered Class D felonies. *See* Tenn. Code Ann. § 39-14-408, Sentencing Comm'n Cmts. ("Vandalism is classified according to the value of the damage done to the property and is punished as theft pursuant to [Tennessee Code Annotated section] 39-14-103 [theft of property].") In support of this argument, the Petitioner cites

to the criminal savings statute, which provides that when a statute is amended, "in the event the subsequent act provides for a lesser penalty, any punishment imposed shall be in accordance with the subsequent act."  Tenn. Code Ann. § 39-11-112.

However, in advancing this argument, the Petitioner ignores the clear caselaw on this very subject.  *See, e.g., State v. Keese*, 591 S.W.3d 75 (Tenn. 2019) ("[A] criminal defendant whose sentence is final prior to the effective date cannot benefit from a statutory amendment that provides for a lesser punishment."); *State v. Tolle*, 591 S.W.3d 539, 546 (Tenn. 2019) (holding that the criminal savings statute does not permit a trial court to modify the offense class of a conviction for which punishment was imposed prior to the amendment); *Anderson v. State*, 692 S.W.3d 94, 107 (Tenn. Crim. App. 2023) ("[T]he amendment to the theft graduation statute does not invalidate the petitioner's prior convictions."); *State v. Terry*, No. E2021-00406-CCA-R3-CD, 2022 WL 1288587, at *16 (Tenn. Crim. App. Apr. 29, 2022) (holding that a defendant whose sentence on a prior conviction was imposed prior to the amendment's effective date is not entitled to its modification).  As the Petitioner's underlying argument is without merit, trial counsel was not deficient for failing to raise it below.  *See Bledsoe v. State*, No. M2004-01132-CCA-R3-PC, 2005 WL 1240172, at *3 (Tenn. Crim. App. May 24, 2005) ("Clearly, trial counsel cannot be considered deficient for failing to make or pursue a motion [or objection] that would have been meritless.").  The Petitioner is not entitled to relief.

## C.      Appellate Counsel

We determine whether counsel's representation on appeal was constitutionally effective using the same *Strickland v. Washington* standard of review applied to claims of ineffective assistance at trial asserted under the Sixth Amendment to the United States Constitution.  *Carpenter v. State*, 126 S.W.3d 879, 886 (Tenn. 2004).  If a claim of ineffective assistance of counsel is based on the failure to raise a particular issue, then the reviewing court must determine the merits of the issue.  *Id.* at 887.  Obviously, if an issue has no merit or is weak, then counsel's performance on appeal will not be deficient if counsel fails to raise it.  *Id.*  Likewise, unless the omitted issue has some merit, the petitioner suffers no prejudice from counsel's failure to raise the issue on appeal.  *Id.*  In sum, "[w]hen an omitted issue is without merit, the petitioner cannot prevail on an ineffective assistance of counsel claim."  *Id.* at 887-88 (citing *United States v. Dixon*, 1 F.3d 1080, 1083 (10th Cir. 1993)).

Because we have already determined that the issues raised by the Petitioner are without merit, he cannot prevail on his claim that appellate counsel was ineffective for

failing to raise them on direct appeal. *See Carpenter*, 126 S.W.3d at 887-88. The Petitioner is not entitled to relief.

## III.    CONCLUSION

Based upon the foregoing and consideration of the record as a whole, we affirm the judgment of the post-conviction court.

 s/ Kyle A. Hixson
KYLE A. HIXSON, JUDGE