IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
September 19, 2017 Session

FILED
12/07/2017
Clerk of the
Appellate Courts

## STATE OF TENNESSEE v. ANTHONY J. HARRIS

**Appeal from the Criminal Court for Knox County
No. 93061, 96566    Bobby R. McGee, Judge**

_____

### No. E2016-01952-CCA-R3-CD

_____

Defendant, Anthony J. Harris, was convicted of two counts of facilitation of felony murder and one count of facilitation of attempted second degree murder. He received an effective sentence of twenty-two years. On appeal, Defendant argues that the evidence at trial was insufficient to support each of his convictions, that his due process and speedy trial rights were violated by the timing of the superseding indictment, that the trial court erred by not allowing Defendant's expert witness to testify, that the State failed to properly preserve evidence, and that the State made improper remarks in their closing argument. After review, we hold that Defendant is not entitled to relief on any of his claims. The judgments of the trial court are affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

TIMOTHY L. EASTER, J., delivered the opinion of the court, in which NORMA MCGEE OGLE and ROBERT W. WEDEMEYER, JJ., joined.

Joseph A. Fanduzz, Knoxville, Tennessee, for the appellant, Anthony Jay Harris.

Herbert H. Slatery III, Attorney General and Reporter; Courtney N. Orr, Assistant Attorney General; Charme P. Allen, District Attorney General; and Leslie Nassios, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

*Factual and Procedural History*

The Knox County Grand Jury indicted Defendant, along with his co-defendant, Michael Olebe, with first degree premeditated murder on November 3, 2009,[1] for his role in the July 4, 2008 death of William Wheeler, Jr. The State filed a motion to amend the indictment on February 18, 2011. Subsequently, the Knox County Grand Jury filed a superseding indictment on February 22, 2011, that charged Defendant with first-degree premeditated murder, first-degree felony murder committed in the perpetration of a kidnapping, and first-degree felony murder committed in the perpetration of a theft. On that same day, Defendant filed a response to the State's motion to amend the original indictment, and two days later, Defendant moved for the felony murder counts to be stricken from the superseding indictment. The trial court never ruled on the State's motion to amend the original indictment. On March 1, 2011, a judgment was entered dismissing Defendant's first-degree premeditated murder charge from the original indictment. That same day, only one week after the filing of the superseding indictment, trial began.

The testimony at trial regarding the events on July 4, 2008, was fairly consistent among all of the witnesses, including Syeisha Kilby, Lisa Tannehill, Laquinda Hardin, and Defendant, who testified on his own behalf. Thus, we will present the facts of the case as a single narrative up to the point that the State's case and the defense's case diverge.

On the morning of July 4, 2008, Defendant woke up to his girlfriend, Lisa Tannehill, telling him that Laquinda Hardin, Defendant's first cousin, wanted Defendant to bring her son home. Ms. Hardin's son had spent the night at Ms. Tannehill's house after a playdate with Ms. Tannehill's son. To take Ms. Hardin's son home, Defendant drove to Alcoa, Tennessee. Upon his arrival at Ms. Hardin's house, Defendant met William Wheeler, Jr., the victim, who had given Ms. Hardin a ride to her house. After talking for a while, Defendant and the victim went back to Defendant's house that he shared with Ms. Tannehill.

Upon returning to Defendant's house, Defendant introduced the victim to Ms. Tannehill, put on some music, and offered the victim vodka, gin, and moonshine. According to Defendant, the victim requested some gin, and Defendant poured him a cup. At that point, Defendant decided to take a shower. After bathing, Defendant joined the victim for another drink. On top of that drink, the victim had a shot of moonshine. Some conversation occurred, and then the victim expressed his desire for some crack cocaine. Defendant and the victim left in the victim's car to go find some crack cocaine.

---

[1] The technical record does not contain Defendant's original indictment. However, Defendant's response opposing the State's motion to amend the indictment provides the date that the original indictment was entered.

- 2 -

Defendant and the victim proceeded to the victim's house where the victim took a shower and had another drink. The two men spent about thirty minutes at the victim's house before they drove to an area of town known as Lonsdale in search of some crack cocaine. At a place called "Under the Tree," the victim was able to get his hands on some crack cocaine, and Defendant met a girl that he knew from school nicknamed "Binky." "Binky" joined the two men in the victim's car, and they drove to a house that belonged to an acquaintance of "Binky." At that house, "Binky" and the victim went into a room by themselves for about thirty minutes. When they emerged, "Binky" left the house to get some more crack, and Defendant observed that the victim was high. Once "Binky" returned, she and the victim went back into the room for about fifteen more minutes. "Binky" left, and Defendant went inside the room to check on the victim. The victim could not talk. In the words of Defendant at trial, the victim was "geeked."

According to Defendant, the victim wanted some more crack. However, neither of the men had any money. So, Defendant called Michael Olebe, nicknamed "O.D.," and spoke with him on the phone. Defendant and the victim drove to Mr. Olebe's house to see if Mr. Olebe would sell them some crack on credit. However, Mr. Olebe refused their request. In order to work out a deal, Defendant offered Mr. Olebe a pistol to hold as collateral until Defendant could get home and get the money. Mr. Olebe accepted this deal. As part of the deal, Defendant received forty dollars' worth of powdered cocaine, which he split with the victim. Both men snorted the cocaine powder. Next, Mr. Olebe and the victim spent some time outside of Mr. Olebe's house by themselves. Defendant claims that the victim asked him to hold onto the victim's phone during the time that the victim and Mr. Olebe were outside. Defendant maintains that he returned the phone to the victim when he came back inside. All three men—Defendant, the victim, and Mr. Olebe—left Mr. Olebe's house in the victim's vehicle.

The three men drove to an ATM. The victim's bank records show that he made a transaction at approximately 3:11 p.m. on July 4, 2008. The video footage from the ATM shows the victim getting out of the driver's seat of a small SUV and walking up to the ATM. The video also depicts a person sitting in the front passenger seat of the SUV with their arm sticking out of the open window, and there is a shadow in the back seat that makes it appear as if someone was in the back seat. According to Defendant, Mr. Olebe was in the passenger seat and Defendant was in the back seat.

From the ATM, the three men travelled to Morningside Park and met a woman, who was later identified as Syeisha Kilby. Ms. Kilby admitted that she had been "drinking a lot" on July 4, 2008, having consumed approximately "six beers and some liquor" before speaking to Defendant, the victim, and Mr. Olebe. When the men talked to Ms. Kilby, she and Mr. Olebe began flirting with each other. While Mr. Olebe continued to speak with Ms. Kilby, Defendant and the victim shared some vodka.

Eventually, Ms. Kilby joined the three men in the car and they drove from Morningside Park to Franklin T. Fishback's house.

Up to this point in the sequence of events that occurred on July 4, 2008, the facts presented at trial were consistent. The testimony at trial diverged when describing the following events. On one hand, we have the testimony of Defendant, and on the other, the testimony of Ms. Kilby and the other witnesses presented by the State. Additionally, Ms. Kilby's testimony is not entirely consistent with that of other witnesses presented by the State. We set forth the testimony in turn, beginning with the testimony of the Defendant.

*A. Defendant's Testimony*

According to Defendant, the group went to Mr. Fishback's house because "[Ms. Kilby] had stated she wanted to trade sex for some crack." Everyone was intoxicated. While the group was at Mr. Fishback's house, a fight broke out between Mr. Olebe and the victim. Mr. Olebe pulled the victim into the back seat of the SUV. Mr. Fishback told them to leave. At this point, Defendant was in the driver's seat and Ms. Kilby was in the front passenger's seat. The victim and Mr. Olebe were in the back seat fighting. Defendant described the altercation between the victim and Mr. Olebe as a simple fight, until "the gun goes off. . . . [Mr.] Olebe shot [the victim]." At that point, Mr. Olebe exclaimed, "I shot the m—f—er in the leg." Further struggle ensued, and Defendant "heard another shot." Defendant maintained that Mr. Olebe had possession of the gun the entire time. Then, "[Ms. Kilby] said ['] be quiet, listen. This m—f—er's snoring.['] She said ['] give it here. I'll shoot the m—f—er.[']" According to Defendant, Ms. Kilby got on her knees in the passenger seat and leaned between the seats. Mr. Olebe positioned the victim's body and pulled the victim's shirt up. Then, Defendant heard a third shot.

Defendant testified that he, Mr. Olebe, and Ms. Kilby drove to Riverside to dump the body. On their first attempt, a car drove by. So, they circled the area, came back to the same place, and dumped the body of the victim. From there, they travelled to a house owned by Larissa Harris. While at Ms. Harris's house, Defendant sat on the steps of the house while Mr. Olebe and Ms. Kilby cleaned out the victim's vehicle. During this time, Defendant spoke to Derrick Harris, Ms. Harris's brother. Mr. Olebe and Ms. Kilby got a gasoline can from one of Ms. Harris's neighbors, and they drove to Quick Pantry and put some gasoline in the can.

The victim's car was then driven to a location close to Mr. Olebe's house. Mr. Olebe poured gasoline on the vehicle, and Ms. Kilby lit a piece of paper and threw it inside the vehicle. Once the vehicle was ablaze, Defendant, Mr. Olebe, and Ms. Kilby walked back to Mr. Olebe's house. At this point, the group parted ways. According to Defendant, Mr. Olebe went home with the gun that was used to shoot the victim.

Meanwhile, Defendant, with Ms. Kilby in tow, went to his ex-father-in-law's house to ask for a ride.

Later in the evening, Defendant and Ms. Kilby rejoined Mr. Olebe at Walter P. Taylor Homes. Mr. Olebe stayed with them for around an hour. After Mr. Olebe left, Ms. Tannehill picked up Defendant and Ms. Kilby and dropped off Defendant at "Gene's Place." Defendant went inside, and Ms. Kilby eventually joined him. Defendant claims that he got the gun back from Mr. Olebe that same night and returned it to Ms. Tannehill the next day. Eventually, Defendant spoke with Investigator Charles Lee and gave him an account of what occurred.

*B. Testimony of Syeisha Kilby*

The State presented the testimony of Ms. Kilby, and her testimony recounting the events of July 4, 2008, crucially differs from Defendant's. According to Ms. Kilby, Defendant and the victim began arguing at Mr. Fishback's house because Defendant wanted to drive. Defendant and the victim started scuffling, and Defendant made him get in the back seat by pushing the victim as Mr. Olebe pulled the victim into the back seat. The victim was struggling and fighting when he kicked out a window in the car. At that point, Mr. Fishback came outside and told them that they could not be fighting at his house. So, they drove away in the car. When they left, Defendant was driving the car, Ms. Kilby was in the passenger seat, Mr. Olebe was in the back seat behind the passenger, and the victim was in the back seat in the middle. As they drove away, Mr. Olebe was punching the victim repeatedly and choking him. Ms. Kilby testified, "[The victim] was sitting up but he was in the middle and he was leaned forward and [Mr.] Olebe was choking him from the side." Ms. Kilby described Mr. Olebe as having his back against the inside of the rear passenger door.

Ms. Kilby recounted that, after a few turns, Defendant pulled a gun out of his waistband, told the victim "to shut up or he was going to kill him," and pistol whipped him. Shortly thereafter, the victim was not quiet, and Defendant reached between the seats and shot the victim. After that, Defendant handed the gun to Mr. Olebe and another shot was fired. Ms. Kilby only heard two shots. According to Ms. Kilby, she never fired the gun. After Mr. Olebe shot the victim, he handed the gun back to Defendant. Then, Mr. Olebe belted the victim into the backseat behind the driver.

Ms. Kilby claims that after driving around for a while, they stopped on Riverside Drive and Mr. Olebe pulled the victim out of the backseat and dumped the victim's body. Once the victim's body was dumped, Ms. Kilby stated that they went to a house that belonged to Defendant's cousin. Ms. Kilby claimed that she sat on the steps of the house while Mr. Olebe and Defendant cleaned out the car. Ms. Kilby and Mr. Olebe went to a neighbor's house and asked for a gas can. Defendant, Ms. Kilby, and Mr. Olebe drove to

Quick Pantry and Mr. Olebe went inside and bought some gas. Ms. Kilby recounted, "They doused the car with gasoline and set it on fire. . . . with a match."

After setting the car on fire, Ms. Kilby and the two men went to a house. Defendant told Ms. Kilby that the house belonged to his "uncle." At that house, Defendant burned and smashed the victim's cell phone in the back yard and gave the gun to his "uncle," who wrapped the gun in a towel and took it to his basement. Mr. Olebe never went inside the house with Defendant and Ms. Kilby.

According to Ms. Kilby, Mr. Olebe went to his house to change his clothes and returned about thirty minutes later. At that point, Defendant's "uncle" gave the group a ride to Walter P. Taylor Homes. After a few hours, Mr. Olebe left and gave his cellphone number to Ms. Kilby. He told her to do whatever Defendant told her to do or he would kill her. After this statement was made, Ms. Kilby never saw Mr. Olebe again. Ms. Kilby claims that she and Defendant went to Gene's Place to get some crack cocaine. On the ride to Gene's Place, Ms. Kilby overheard Ms. Tannehill telling Defendant that she was going to call the police if he did not return her gun. Defendant and Ms. Kilby left Gene's Place, went to Walter P. Taylor Homes, smoked some crack cocaine, and continued drinking. Ms. Kilby described herself as intoxicated. At around noon the next day, Defendant and Ms. Kilby parted ways and never had contact again.

Ms. Kilby testified that she spoke with Investigator Lee, told him about all of the events, and showed him the locations where everything occurred. At trial, Ms. Kilby identified Defendant as the person who first shot the victim. On cross-examination, Ms. Kilby was impeached with a prior inconsistent statement regarding some details of the story such as whether they went to an ATM, at what point she first saw the gun, and the color of the gun.

*C. Testimony of Other Witnesses*

The State also called Mr. Fishback to testify at trial, and he had his own account of what happened at his house. On the day of the shooting, Defendant, Mr. Olebe, and two people unknown to Mr. Fishback arrived at his house. Mr. Olebe was the first person to exit the vehicle, and Mr. Fishback noticed Defendant and an unknown woman in the back seat of the car. The other person unknown to Mr. Fishback was the driver of the vehicle. After exiting the vehicle, Mr. Olebe approached Mr. Fishback and "pulled [Mr. Fishback] off to the side and said he wanted tough up or rough up or – actually he was saying in other words he wanted to whip somebody's butt inside of my home." Mr. Fishback refused to allow Mr. Olebe to "rough up" anyone at his house, and Mr. Fishback went back inside his house. Moments later, Mr. Fishback returned outside to see Mr. Olebe grab the man in the driver's seat by the mouth and pull him backwards between the seats toward the backseat of the vehicle. Mr. Fishback observed the man flipping around and

thought that the man "couldn't breathe." The man being attacked kicked out the window behind the driver's seat, and the glass fell onto Mr. Fishback's driveway. At some point, Defendant got in to driver's seat and drove off.

Larissa Harris and her brother, Derrick Harris, provided further detail on the events of July 4, 2008. The home at which the car was cleaned out belonged to Ms. Harris. On the day of the shooting, Mr. Olebe called Ms. Harris and asked if she was home, but she never gave Mr. Olebe permission to be on her property. Incidentally, Mr. Harris went by his sister's house. When Mr. Harris arrived, he saw Mr. Olebe, whom he had met once before, in front of the house. Mr. Olebe claimed that he was waiting on Ms. Harris. Mr. Harris also saw Defendant sitting on the steps at the corner of the house drinking a half-gallon of vodka. Mr. Harris approached Defendant and noticed that Defendant had his head down and was shaking his head. Mr. Harris asked, "What's wrong?" In response, Defendant just shook his head and mumbled, "We just f-d someone up." When Mr. Harris asked Defendant to be more specific, Defendant said, "We just fucked someone up." Mr. Harris replied, "What?" Defendant repeated, "We just fucked someone up." Mr. Harris questioned, "For real?" At that point, Mr. Harris looked toward his right and saw a woman "cleaning out a car." Mr. Harris never spoke with the woman, and Mr. Olebe had already left. Mr. Harris left the house as the woman was cleaning out the car, and Defendant remained on the steps. Though he could not be sure, Mr. Harris believed that Defendant had a gun in his waistband.

With regard to the gun that was used in the attack, the State put on testimony of Ms. Tannehill and a firearms examiner. Ms. Tannehill testified that, at some point, she discovered that her gun was missing. This prompted her questioning of Defendant regarding the whereabouts of her gun while she drove Defendant and Ms. Kilby to Gene's Place. In response to Ms. Tannehill's inquiry, Defendant stated that her gun was "over at his cousin's house." On July 5, 2008, the gun was returned to Ms. Tannehill, but it later went missing again. Ms. Tannehill never recovered the gun. Ms. Tannehill described the gun as a gray 9 millimeter manufactured by Skyy that was purchased from Coal Creek Armory.

Officer Patricia Resig, the firearms examiner with the Knoxville Police Department, analyzed the bullets recovered from the victim's body and clothing. While she could not definitively say that the two recovered bullets were fired from the same gun, she did determine that the bullets were fired from a gun with rifling consisting of seven lands and grooves and a right hand twist. Officer Resig explained that the lands and grooves inside the barrel of a firearm create impressions on a bullet as it travels down the barrel after being fired. These impressions can be used to compare two bullets to see if they were fired from the same gun or to match a bullet to the gun from which it was fired. Through her research, she discovered that Skyy Industries manufactured a 9 millimeter pistol with seven lands and grooves and a right hand twist and that no other

firearm in the Federal Bureau of Investigation database had those characteristics. Investigator Lee collected a handgun from Mr. Olebe's mother after she called and told him that she was in possession of a handgun that she believed was missing. However, Investigator Lee testified that the firearm that he collected was not the firearm that fired the bullets recovered from the victim.

Dr. Darinka Mileusnic-Polchan testified that one bullet was recovered from the victim's body and another was recovered from the victim's shorts. However, Dr. Mileusnic-Polchan concluded that the victim suffered three gunshot wounds. The wound that "essentially killed [the victim]" was the wound to the upper gastric region. Dr. Mileusnic-Polchan stated that the distance from which the gun was fired to inflict this wound was "less than [a] foot." The victim also had a gunshot wound to the lumbar region of the back that was a "contact gunshot wound, meaning that when the shot was delivered the muzzle was tightly applied against the skin on the body." The other very close range gunshot wound was a wound to the victim's left leg. Dr. Mileusnic-Polchan could not offer an opinion on which gunshot wound was inflicted first. When asked about the possibility of the driver firing the shots, she responded, "Some of the wounds, I would say it's possible. Some of the wounds it's not." Dr. Mileusnic-Polchan documented approximately thirty-five different blunt force trauma injuries on the victim. Fourteen of those injuries were to the victim's head. Multiple sharp force trauma injuries were noted as well, but Dr. Mileusnic-Pochan noted that the sharp force trauma injuries were relatively superficial.

Defendant attempted to present expert testimony about the possibility of firing a gun from the driver's seat and striking a passenger in the rear seat. The State objected to the introduction of this testimony. After Defendant's offer of proof, the trial court excluded the testimony.

A jury convicted Defendant of facilitation of attempted second degree murder as a lesser-included offense of first degree murder in Count One and facilitation of felony murder as a lesser-included offense of felony murder in both Counts Two and Three. The trial court merged Counts One and Three into Count Two and imposed a total effective sentence of twenty-two years to be served consecutively to an unrelated federal sentence. Defendant filed a timely motion for new trial that was denied. Now, Defendant appeals.

*Analysis*

On appeal, Defendant argues that the evidence at trial was insufficient to support each of his convictions, that his due process and speedy trial rights were violated by the timing of the superseding indictment, that the trial court erred by not allowing Defendant's expert witness to testify, that the State did not properly preserve evidence, and that the State made improper remarks in their closing argument. The State contests

each of these claims. Following out review, we hold that Defendant is not entitled to relief.

*I. Validity of the Superseding Indictment*

Defendant argues that the superseding indictment violated his right to a speedy trial because there was a nineteen-month delay between Defendant's arrest and the superseding indictment. Defendant maintains the reason for the delay is unclear. He claims he was prejudiced by the short length of time to prepare a defense and by losing around one year of jail credit on his federal sentence. Also, Defendant argues that the superseding indictment violated his right to due process because he was prejudiced and the circumstances reveal that the State was seeking a tactical advantage over Defendant. Further, Defendant contends that the delay in the issuance of the superseding indictment was through no fault of his own. The State responds by arguing that Defendant failed to provide an adequate record for review of this issue. We agree with the State.

A defendant has the duty to prepare a transcript of the evidence necessary to convey a fair, accurate, and complete account of what transpired in the lower court. Tenn. R. App. P. 24(b). If such a transcript is not available, a defendant "shall prepare a statement of the evidence or proceedings from the best available means . . . filed with the clerk of the trial court within 60 days after filing the notice of appeal." Tenn. R. App. P. 24(b). Allegations contained in pleadings and statements made by counsel during a hearing or the trial are not evidence, and "neither can be considered in lieu of a verbatim transcript or statement of the evidence and proceedings." *State v. Draper*, 800 S.W.2d 489, 493 (Tenn. Crim. App. 1990). Accordingly, Defendant's failure to include a complete record of the proceedings forming the basis of this issue results in a waiver of any challenge to the lower court's rulings. *See State v. Ballard*, 855 S.W.2d 557, 560-61 (Tenn. 1993) (determining appellant's failure to provide court with complete record relevant to issue presented constitutes waiver of issue). In the absence of a complete record, "the appellate court must conclusively presume that the ruling of the trial judge was correct, the evidence was sufficient to support the defendant's conviction, or the defendant received a fair and impartial trial." *Draper*, 800 S.W.2d at 493. The record in this case does not contain a transcript or statement of the evidence presented at the hearing on Defendant's motion to dismiss the indictment and to strike the felony murder counts held by the trial court on February 28, 2011. Thus, the record is inadequate for our review and this Court is precluded from reviewing Defendant's claims that his rights to due process and a speedy trial were violated.

Even if this Court conducted a plain error analysis, Defendant would not be entitled to relief because the record on appeal does not "clearly establish what occurred in the trial court," the first factor in the plain error analysis. *See State v. Smith*, 24 S.W.3d 274, 282-83 (Tenn. 2000). Therefore, Defendant is not entitled to relief on this issue.

*II. Preservation of Evidence*

Defendant argues that the trial court erred when it denied his motion to dismiss the indictment based upon the State's failure to preserve the vehicle in which the shooting took place. According to Defendant, the vehicle could have provided exculpatory evidence regarding how the bullets were fired and where they struck the vehicle. The State argues that Defendant has not provided an adequate record for our review because the record does not contain a transcript of the hearing on Defendant's motion to dismiss the indictment. We agree with the State.

As set forth above, a Defendant has a duty to prepare an adequate transcript or a statement of the evidence, and failure to do so results in waiver of the issue. Tenn. R. App. P. 24(b); *see also Ballard* 855 S.W.2d at 560-61; *Draper*, 800 S.W.2d 493. The trial court's minutes from February 28, 2011, indicate that Defendant's motion to dismiss the indictment came to be heard and was denied. No transcript for this hearing is included in the record. Because Defendant has failed to include a transcript of the hearing on his motion to dismiss the indictment, this Court is precluded from reviewing Defendant's claim that the State failed to properly preserve evidence. Further, the lack of an adequate record also prevents Defendant's issue from receiving plain error review because the record does not "clearly establish what occurred in the trial court." *See Smith*, 24 S.W.3d at 282-83.

*III. Exclusion of Expert Testimony*

Defendant argues that the trial court erred by disallowing his proposed expert's testimony because the trial court improperly excluded the testimony based upon the trial court's own opinion of the "veracity of [the expert's] testimony rather than an application of the legal standards for opinion testimony." The State argues that the trial court properly applied the factors found in *McDaniel v. CSX Transportation, Inc.*, 955 S.W.2d 257 (Tenn. 1997), and did not abuse its discretion. We agree with the State.

At trial, the Defendant sought to introduce the testimony of James Parham, a civil engineer with experience in accident reconstruction. After the State's objection, Defendant gave an offer of proof where Mr. Parham described his methodology of creating a model of the victim and the gunshot wounds. He stated, "My opinion is that the likelihood of the shot being–any of the three shots occurring from the driver's seat is more probable than not a likelihood." Then, Mr. Parham gave what appears to be a conflicting response only a few questions later in the cross-examination by the State when he stated, "Well, I can rephrase it into a more reasonable doubt. It would be very difficult, if not impossible, for these shots to have come from the driver's seat." On cross-examination, he admitted that he was not trained in forensic pathology, anatomic

pathology, or terminal ballistics. Further, he conceded that his model was incapable of independent movement. Mr. Parham was unable to cite any sources to support the use of a model to replicate firing angles with respect to terminal ballistics, his methodology had not been peer reviewed, and he could not point to a specific error rate. Further, Mr. Parham admitted that he had never testified about bullet trajectory in a moving vehicle.

In making its ruling on the admissibility of Mr. Parham's testimony, the trial court found:

> [T]here is no recognized methodology for conducting the kind of testing that Mr. Parham conducted. No known rate of error for this kind of scientific analysis. No peer review has been done of his particular procedures. This is not a known body of science. This was a reenactment prepared for litigation.

The trial court noted that "there is no way that the expert can testify that the car he used was in the same condition as the car that was involved in this crime." The trial court added that "the dummy that's been used is not a completely accurate copy of the victim[;] furthermore, it's rigid, it can't twist, it can't fight, it can't struggle, it can't move." Based upon those reasons, the trial court held that Mr. Parham's "expert opinion will not substantially assist the trier of fact to understand the evidence" and that Mr. Parham's expert opinion "doesn't help the jury determine a fact in issue." Accordingly, the trial court excluded Mr. Parham's testimony.

A trial court has broad discretion over matters regarding the qualifications, admissibility, relevancy, and competency of expert testimony. *See McDaniel*, 955 S.W.2d at 263-64; *Ballard*, 855 S.W.2d at 562. A trial court's ruling shall not be overturned unless the trial court abused its discretion in admitting or excluding the expert testimony. *Ballard*, 855 S.W.2d at 562. "[A]n appellate court should find an abuse of discretion when it appears that the trial court applied an incorrect legal standard, or reached a decision which is against logic or reasoning that caused an injustice to the party complaining." *State v. Shuck*, 953 S.W.2d 662, 669 (Tenn. 1997).

Rule 702 of the Tennessee Rules of Evidence sets forth the requirements for the admissibility of opinion testimony by an expert witness:

> If scientific, technical, or other specialized knowledge will substantially assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise.

The expert's opinion must be supported by trustworthy facts or data "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject." Tenn. R. Evid. 703. The determining factor is "whether the witness's qualifications authorize him or her to give an informed opinion on the subject at issue." *State v. Stevens*, 78 S.W.3d 817, 834 (Tenn. 2002). Evidence constitutes "'scientific, technical, or other specialized knowledge,' if it concerns a matter that 'the average juror would not know, as a matter of course.'" *State v. Murphy*, 953 S.W.2d 200, 203 (Tenn. 1997) (quoting *State v. Bolin*, 922 S.W.2d 870, 874 (Tenn. 1996)).

In *McDaniel*, our supreme court adopted the following non-exclusive list of factors that a trial court should consider when determining the reliability of expert testimony: (1) whether the scientific evidence has been tested and the accompanying methodology with which it was tested; (2) whether the evidence has been subjected to peer review or publication; (3) whether the potential rate of error is known; (4) whether the evidence is generally accepted in the scientific community; and (5) whether the expert conducted the research in the field independent of litigation. 955 S.W.2d at 265. A trial court acts as a gatekeeper to ensure that the expert testimony meets "'the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.'" *Brown v. Crown Equip. Corp.*, 181 S.W.3d 268, 273 (Tenn. 2005) (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1998)). However, the *McDaniel* factors are only relevant to the extent they are reasonable measures of testing the reliability of the proposed expert testimony. *Id.* at 277.

In this case, it is apparent that the trial court considered the factors outlined in *McDaniel* even though the court did not mention the case by name. For the first *McDaniel* factor, the trial court found that Mr. Parham did not follow a "recognized methodology." With regard to the second *McDaniel* factor, the trial court found that no peer review had been performed on the procedures conducted by Mr. Parham. Pertaining to the third *McDaniel* factor, the trial court found that there was no known error rate. On the fourth *McDaniel* factor, the trial court found that "this is not a known body of science." For the final factor, the trial court found that Mr. Parham's reenactment was "prepared for litigation." The trial court properly applied *McDaniel* and made a finding with regard to each factor. Then, the trial court made a ruling in accordance with Rule 702 when the court found that the testimony would not assist the trier of fact. It is obvious that the trial court applied the correct legal standard and used sound logic and reasoning. The trial court did not abuse its discretion.

*IV. Improper Remarks during Closing Argument*

Defendant argues that the State made improper remarks about the credibility of Ms. Kilby and Defendant during closing argument that rendered his conviction fundamentally unfair. The State responds by contending that Defendant "waived this

issue because he did not make a contemporaneous objection to the prosecutor's comment" and that Defendant cannot show plain error. We agree with the State.

During closing argument, the State made statements regarding Ms. Kilby's testimony. The State explained that the inconsistencies in her testimony could be attributed to Ms. Kilby's use of drugs and alcohol on the day of the attack on the victim. The State claimed that Ms. Kilby "choked up" on some things when she talked to Investigator Lee, but that Ms. Kilby attempted to "clarify it later in her interview." The State further argued that Ms. Kilby's testimony was "very consistent" with that of Investigator Lee. The State also pointed to various reasons why the Defendant might have an incentive to be less than truthful in his statements to the police and during his testimony. The State pointed out all of the things that Defendant did not tell the police that were presented through the testimony of other witnesses. The State said, "[W]hen more than one person is involved in a crime[,] sometimes it's a race to the police station to see who gets there first to get the best treatment. You know, to get the jump on their accomplices. And that's exactly what was going on with him." Later, the State argued, "[T]alk about inconsistences. I mean, you heard what we heard yesterday and today. You can discount anything this man said. His testimony is not credible." The State implored the jury to "weigh their testimony and just ask yourselves who supports [Ms. Kilby's] version? Who has a reason to lie?" Defendant did not object to any these statements.

Appellate relief is generally not available when a party has "failed to take whatever action was reasonably available to prevent or nullify the harmful effect of any error." Tenn. R. App. P. 36(a). A defendant's "failure to object to the State's argument at trial precludes [this Court's] review of the issue, subject to our noticing 'plain error.'" *State v. Derrick Dewayne Lyons*, No. M2014-00178-CCA-R3-CD, 2015 WL 475158 at *9 (Tenn. Crim. App. Feb. 4, 2015) (citing Tenn. R. App. P. 3(e); Tenn. R. App. 36(a); *State v. Little*, 854 S.W.2d 643, 651 (Tenn. Crim. App. 1992)), *perm. app. denied* (Tenn. Jun. 11, 2015). However, "[w]hen necessary to do substantial justice, an appellate court may consider an error that has affected the substantial rights of a party at any time, even though the error was not raised in the motion for a new trial or assigned as error on appeal." Tenn. R. App. P. 36(b). Each of the following five factors must be established by the record before plain error exists:

> (a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is "necessary to do substantial justice."

*State v. Smith*, 24 S.W.3d 274, 282-83 (Tenn. 2000) (adopting the test established in *State v. Adkisson*, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994)). The burden is on the defendant to establish all five factors, and "complete consideration of all the factors is not necessary when it is clear from the record that at least one of the factors cannot be established." *Id*. Furthermore, the error must be of "such a great magnitude that it probably changed the outcome of the trial." *Id.*

In this case, there was no breach of a clear and unequivocal rule of law. While the scope and depth of closing argument is generally a matter within the trial court's discretion, *State v. Bigbee*, 885 S.W.2d 797, 809 (Tenn. 1994), the State is not free to do what they wish. Arguments are required to be "temperate, based upon the evidence at trial, relevant to the issues being tried, and not otherwise improper under the facts of the law." *State v. Goltz*, 111 S.W.3d 1, 5 (Tenn. Crim. App. 2003) (citing *Coker v. State*, 911 S.W.2d 357, 368 (Tenn. Crim. App. 1995)). Although not exhaustive, this Court has recognized five general areas of potential prosecutorial misconduct during closing arguments: (1) intentionally misstating the evidence or misleading the jury as to the inferences it may draw; (2) expressing personal beliefs or opinions as to the truth or falsity of any testimony or the guilt of the defendant; (3) inflaming or attempting to inflame the passions or prejudices of the jury; (4) injecting issues broader than the guilt or innocence of the accused; and (5) arguing or referring to facts outside the record unless the facts are matters of common knowledge. *Goltz*, 111 S.W. 3d at 6.

As mentioned above, this is a case of two competing accounts of the events that occurred on July 4, 2008. Naturally, a large portion of the closing arguments for both sides would pertain to the credibility of the witnesses. Contrary to Defendant's argument, the prosecutor's remarks during closing argument, when taken in context, were not statements of the prosecutor's personal beliefs or opinions about the witnesses' testimony. It appears from the record that the prosecutor was using the testimony of other witnesses to corroborate the testimony of Ms. Kilby. Similarly, the prosecutor described the precarious situation that Defendant was in to show a motivation for him to be less than truthful. At no point did the prosecutor express a personal opinion or belief as to the truth or falsity of each witness's testimony. Thus, no clear and unequivocal rule of law has been breached, and no further analysis is warranted. Defendant has failed to establish that plain error exists.

## V. Sufficiency of the Evidence

Defendant argues that the evidence is insufficient to sustain his convictions of facilitation of felony murder where the underlying felony is kidnapping, facilitation of felony murder where the underlying felony is theft, and facilitation of attempted second degree murder. Specifically, Defendant argues that his convictions for felony murder cannot stand because there was no evidence regarding his intent to commit kidnapping or

theft.  Further, Defendant argues that "it is unclear how the jury found that anyone in the car attempted second degree murder in addition to someone else committing felony murder."  The State contends that the evidence is sufficient to support Defendant's convictions and that any inconsistencies in the verdicts do not affect the validity of his convictions.  We agree with the State.

Well-settled principles guide this Court's review when a defendant challenges the sufficiency of the evidence.  A guilty verdict removes the presumption of innocence and replaces it with a presumption of guilt.  *State v. Evans*, 838 S.W.2d 185, 191 (Tenn. 1992).  The burden is then shifted to the defendant on appeal to demonstrate why the evidence is insufficient to support the conviction.  *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982).  The relevant question the reviewing court must answer is whether any rational trier of fact could have found the accused guilty of every element of the offense beyond a reasonable doubt.  *See* Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).  On appeal, "the State is entitled to the strongest legitimate view of the evidence and to all reasonable and legitimate inferences that may be drawn therefrom."  *State v. Elkins*, 102 S.W.3d 578, 581 (Tenn. 2003).  As such, this Court is precluded from re-weighing or reconsidering the evidence when evaluating the convicting proof.  *State v. Morgan*, 929 S.W.2d 380, 383 (Tenn. Crim. App. 1996); *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990).  Moreover, we may not substitute our own "inferences for those drawn by the trier of fact from circumstantial evidence."  *Matthews*, 805 S.W.2d at 779.  Further, questions concerning the credibility of the witnesses and the weight and value to be given to evidence, as well as all factual issues raised by such evidence, are resolved by the trier of fact and not the appellate courts.  *State v. Pruett*, 788 S.W.2d 559, 561 (Tenn. 1990).  "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'"  *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

### A. Facilitation of Felony Murder

Felony murder is "[a] killing of another committed in the perpetration of or attempt to perpetrate any . . . theft [or] kidnapping[.]"  T.C.A. § 39-13-202.  Generally, facilitation of a felony requires proof beyond a reasonable doubt that "the accused (a) knew another person was going to commit a specified felony and (b) knowingly furnished substantial assistance in the commission of the felony although the accused did not possess the requisite intent to be guilty of the felony."  *State v. Parker*, 932 S.W.2d 945, 950-51 (Tenn. Crim. App. 1996); *see* T.C.A. § 39-11-403.  Specifically, facilitation of felony murder requires proof that:

> 1. One of the felonies listed in Tenn. Code Ann. § 39-13-202(a)(2) or (3) was committed;

2. The victim was killed during the commission of that offense;

3. The defendant knew that another person intended to commit the underlying felony, but he or she did not have the intent to promote or assist the commission of the offense or to benefit in the proceeds or results of the offense; and

4. The defendant knowingly furnished substantial assistance to that person in the commission of the underlying felony.

*State v. Margie Jeanette Farley*, No. M2003-02826-CCA-R3-CD, 2005 WL 366890, at *9 (Tenn. Crim. App. Feb, 16, 2005), *perm. app. denied* (Tenn. June 27, 2005); *see also State v. Ely*, 48 S.W.3d 710, 719-20 (Tenn. 2001). The underlying felonies in this case are kidnapping and theft. T.C.A. § 39-14-103(a). Kidnapping occurs when a person "knowingly removes or confines another unlawfully so as to interfere substantially with the other's liberty" under such circumstances that the other person is exposed to a "substantial risk of bodily injury." T.C.A. §§ 39-13-302(a), -303(a). "A person commits theft of property if, with the intent to deprive the owner of property, the person knowingly obtains or exercises control over the property without the owner's effective consent." T.C.A. § 3914-103.

When viewed in a light most favorable to the State, the evidence presented at trial showed that Defendant pushed the victim into the back seat of the vehicle with Mr. Olebe's assistance. Then, the car window was kicked out, and Mr. Olebe proceeded to violently beat the victim. A reasonable juror could find that the victim was kidnapped when Defendant and Mr. Olebe forced the victim into the back seat of the car, interfering with the victim's liberty, and that the circumstances exposed the victim to substantial risk of bodily injury because a window was kicked out and the victim was beaten. Additionally, the evidence at trial showed that as the above kidnapping as was taking place, Defendant took over driving the vehicle. A reasonable juror could also conclude that Mr. Olebe and Defendant intended to deprive the victim of his vehicle when they forced him into the backseat, and obviously, the victim did not consent. The evidence also showed that the victim was killed after the group left Mr. Fishback's house and that the victim was still fighting and struggling in the back seat at the point that he was shot. A reasonable juror could conclude that the kidnapping and theft were still in progress at the time that the victim was shot because he was still resisting confinement and refusing to consent to the taking of his property.

With regard to the last two elements, the jury could infer that Defendant knew of a plan by Mr. Olebe to commit the kidnapping and theft from the circumstantial evidence that Defendant and Mr. Olebe spoke on the phone, Defendant took the victim to Mr.

Olebe's house, Defendant pushed the victim into the back seat, Defendant took over driving the victim's car, and Defendant destroyed the victim's phone. Further, a reasonable juror could conclude that Defendant furnished substantial assistance by shoving the victim into the back of the car, driving the car, or handing Mr. Olebe the gun. Therefore, a reasonable juror could conclude beyond a reasonable doubt that Defendant was guilty of two counts of facilitation of felony murder with kidnapping and theft as the underlying felonies.

*B. Facilitation of Attempted Second Degree Murder*

The elements of facilitation listed above also apply to facilitation of attempted second degree murder. As applicable in this case, second degree murder is a "knowing killing of another[.]" T.C.A. § 39-13-210(a)(1).

> A person commits criminal attempt who, acting with the kind of culpability otherwise required for the offense:
>
> (1) Intentionally engages in action or causes a result that would constitute an offense, if the circumstances surrounding the conduct were as the person believes them to be;
>
> (2) Acts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part; or
>
> (3) Acts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense.

T.C.A. § 39-12-101(a). In other words, "to support a conviction for facilitation of attempted second degree murder . . . the evidence must establish the defendant knew the [gunman] intended to commit a knowing killing and substantially assisted in the commission of the offense." *State v. Pharez Price*, No. M2002-01717-CCA-R3-CD, 2003 WL 1868653 at *9 (Tenn. Crim. App. Apr. 11, 2003), *perm. app. denied* (Tenn. Oct. 13, 2003). "It is no defense to prosecution for criminal attempt that the offense attempted was actually committed." T.C.A. § 39-12-101(c).

Viewing the evidence in a light most favorable to the State, a reasonable juror could credit the testimony of Ms. Kilby and find the following: Defendant told the victim "to shut up or he was going to kill him;" Defendant handed the gun to Mr. Olebe; and Mr. Olebe fired two shots which struck the victim. Defendant's earlier statement of his intent

- 17 -

to kill the victim could give rise to the inference in a reasonable juror's mind that Defendant knew that Mr. Olebe also intended to kill the victim when Defendant handed him the gun. Thus, a reasonable juror could find beyond a reasonable doubt that Defendant knew Mr. Olebe intended to knowingly kill the victim and that Defendant substantially assisted him by handing him the gun. The evidence is sufficient to support a conviction for facilitation of attempted second degree murder.

When it comes to Defendant's argument that "it is unclear how the jury found that anyone in the car attempted second-degree murder in addition to someone else committing felony murder," we do not see how it is "unclear." A reasonable juror could find that two distinct events took place. One event occurred when Defendant facilitated attempted second degree murder by handing Mr. Olebe the gun before Mr. Olebe shot the victim, inflicting a non-fatal wound. The victim's eventual death does not mean that Defendant's conviction for attempt cannot stand. *See* T.C.A. § 39-12-101(c); *State v. Thorpe*, 463 S.W.3d 851, 862 (Tenn. 2015) (stating that "[p]roof that the defendant failed to complete the crime is not an element of the offense of criminal attempt."). A separate event occurred when Defendant facilitated felony murder by pushing the victim into the back seat, driving the car, and providing the gun during the commission of a theft and kidnapping during which the victim was killed. If Defendant's argument were interpreted as an argument that the verdicts were inconsistent, as the State interprets Defendant's argument in their brief, we refuse to disturb jury verdicts by speculating as to how they were reached. *See Wiggins v. State*, 494 S.W.2d 92, 94 (Tenn. 1973). The evidence is sufficient for all of Defendant's convictions.

*Conclusion*

For the aforementioned reasons, the judgments of the trial court are affirmed.

_____
TIMOTHY L. EASTER, JUDGE