IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
December 11, 2019 Session

## STATE OF TENNESSEE v. JERMAINE NELSON BUFORD

**Appeal from the Criminal Court for Davidson County**
**No. 2017-A-541     Mark J. Fishburn, Judge**

_____

### No. M2019-00402-CCA-R3-CD

_____

Jermaine Nelson Buford, Defendant, appeals from his convictions for possession of .5 grams of more of cocaine with intent to sell, aggravated assault, felony evading arrest, evading arrest, vandalism of property over $500, and simple possession. On appeal, Defendant argues, among other things, that (1) the State violated *State v. Ferguson* by failing to preserve an audio recording of the drug transaction that formed the basis of the indictment; (2) the trial court erred by refusing to give the missing witness instruction when the confidential informant did not testify at trial; and (3) the State committed a *Brady* violation by failing to disclose witness information. After a review, we determine Defendant has waived several issues for failure to either raise them in the trial court and/or properly present argument or authority to support the issues in this Court. As to the remaining issues, we determine Defendant is not entitled to relief. However, we remand the matter to the trial court for entry of a corrected judgment form for the conviction for vandalism.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed and Remanded**

TIMOTHY L. EASTER, J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER and ROBERT L. HOLLOWAY, JR., JJ., joined.

Michael Freeman, Nashville, Tennessee, for the appellant, Jermaine Nelson Buford.

Herbert H. Slatery III, Attorney General and Reporter; James E. Gaylord, Senior Assistant Attorney General; Glenn R. Funk, District Attorney General; and Mindy Morris and Andrea Green, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

Defendant was indicted by the Davidson County Grand Jury in January of 2017 in a multi-count indictment for the following offenses: sale of .5 grams or more of cocaine; possession of .5 grams or more of cocaine with intent to sell or deliver; aggravated assault against a law enforcement officer with a deadly weapon; evading arrest with risk of death or injury; evading arrest; vandalism of property valued at $1,000 or more but less than $10,000; simple possession of marijuana; driving on a revoked driver's license; and leaving the scene of an accident.

Prior to trial, the State filed a notice to seek enhancement punishment. The notice included a list of eight prior felony drug convictions. Defendant filed a notice of alibi, claiming that he was at work at the time of the commission of the offense. Defendant also filed a motion to dismiss the indictment after being informed by counsel for the State that a recording of the drug transaction that formed the basis for the indictment was made but not preserved. In response to this motion, the State dismissed the first count of the indictment, the charge relating to the sale of cocaine. Defendant also filed a motion to exclude evidence based on the State's failure to name the confidential informant despite a discovery request. The trial court denied this motion.

After the State dismissed Count 1, charging Defendant with the sale of .5 grams of more of cocaine, the indictment was reissued with the counts renumbered. The reissued indictment charged Defendant in Count 1 with possession of .5 grams of more of cocaine with the intent to sell, in Count 2 with aggravated assault, in Count 3 with evading arrest with a risk of death or injury, in Count 4 with evading arrest, in Count 5 with vandalism of property valued at $1,000 or more but less than $10,000, in Count 6 with simple possession of marijuana, in Count 7 with driving on a revoked driver's license, and in Count 8 of leaving the scene of an accident. The trial court later withdrew Count 7, driving on a revoked license, and modified Count 5, vandalism of property, to reflect property valued at more than $500 but less than $1,000.

On the morning of trial, Defendant filed a motion to compel and argued to the trial court that the State failed to disclose the identity of the confidential informant when the "entire case revolved around who was driving [the] vehicle." The State claimed that they did not have current contact information for the informant and that they tried unsuccessfully to contact the confidential informant prior to trial. The trial court took the matter of "whether or not there should be a missing [witness] instruction given" under advisement but ordered the trial to proceed.

At trial, Detective Seth England of the Metropolitan Nashville Police Department ("MNPD") testified that he was assigned to the East Crime Suppression Unit on November 16, 2016. In that position, his focus was on "street to mid-level drug dealers

and street-level prostitution" by initiating "undercover narcotics transactions" and performing "parking lot enforcement." On the day of the incident, Detective England approached a "street-level prostitute" about participating in a narcotics transaction as a confidential informant. The confidential informant told officers that she would participate and could arrange a transaction with "Shakey." Detective England explained that it was "more common than not" to utilize someone as a confidential informant immediately after their own arrest to "on-the-spot help you recover certain kind[s] of narcotics." According to Detective England, this particular confidential informant did not have a lengthy record, with approximately sixteen prior misdemeanors and no prior felonies. In addition, she did not appear to be under the influence of drugs. The confidential informant was "thoroughly" searched, "strip[ped] of any monetary funds, any personal cash," and given "specifically marked money."

Detective Forrest Drake, another member of the East Crime Suppression Unit, was "assigned to pre-operation surveillance" during the controlled buy. Additionally, he was tasked with assisting as a "takedown officer" who would move in as the drug transaction was completed to protect the confidential informant and take the dealer into custody. Detective Drake was told by Detective England to look for a "black SUV or a maroon four-door vehicle." When he got to the area, he saw a maroon Impala parked on the street "in between North 7th and North 8th on Evanston" with its lights on. He did not see a black SUV.

Sergeant David Layne of the MNPD was the supervisor of the East Crime Suppression Unit at the time of the incident. At trial, Sergeant Layne testified as an expert in street-level narcotics. On the day of the incident, Sergeant Layne was part of the pre-surveillance team, positioned near the location where the drug transaction was to occur, on North 7th Street near Evanston. He was "parked alongside of the street, attempting to blend in."

Detective England explained that he utilized his "work" cell phone as the phone the confidential informant would utilize to set up the controlled buy. Several calls were made by the confidential informant using Detective England's phone to arrange the sale. During one of these the conversations, the confidential informant asked the person on the other end of the phone for "powder." During two additional calls to Detective England's phone from the phone number called by the confidential informant to arrange the sale, Detective England could hear the person on the other end of the phone inquire about the confidential informant's whereabouts.

Detective England drove the confidential informant to the prearranged location for the drug sale, North 8th and Evanston, and dropped her off at around 6:15 p.m. There were five members of the police unit present in the area that evening, and at least one car was positioned in a location from which the transaction could be viewed. Sergeant Layne

was in this car. Detective England was not positioned in a location from which he could view the drug transaction. Instead, he was communicating via radio with other members of the police department and listening to the transaction on a recording device planted on the confidential informant.

Robert Young, who was a retired MNPD officer at the time of the trial, assisted in "close cover of the confidential informant." His undercover vehicle was positioned on North 8th so that he could "maintain a visual of the confidential informant as they approach[ed] the dealer." Officer Young watched the confidential informant walk toward Evanston and placed his car in drive in order to maintain visual contact with the confidential informant as she approached the location for the drug sale. Officer Young saw the confidential informant get into the passenger's seat of a maroon Impala. As he drove past the Impala "very slowly," he could hear "what [he] thought was the good deal signal given over the listening device."

Detective England explained that a drug transaction is normally a "very, very quick" exchange of money and drugs between the confidential informant and the drug-dealer. While listening to the actions of the confidential informant, Detective England also surmised that the transaction was completed, so the officers "moved in to perform a take-down on the maroon Impala." Officer Young, whose car was still near the Impala, placed his car in reverse so he could use his car to block the Impala from leaving the area. Other officers surrounded the Impala in their undercover cars, initiating their lights and sirens. Detective Drake was driving one of these cars, and his car was positioned in front of the Impala, near Officer Young's car. At that point, Detective Drake could not see who was in the vehicle.

Sergeant Layne "looped in towards the driver's side of [the Impala]" in his SUV. The high beams and blue lights in the grill of his SUV were activated. Sergeant Layne's SUV was about six feet away from the Impala. At the time, it was dark outside, but there were streetlights in the area providing illumination. Sergeant Layne had a direct view of the person in the driver's seat of the Impala and identified Defendant as the driver of the vehicle.

By this time, Detective England had moved his car toward the location of the sale, and "at that point the [person driving the Impala] decided to flee" with the confidential informant still inside the vehicle. Even though Detective England was driving toward the Impala in his car from the "very back" of the pack of police vehicles, Detective England could see the "maroon Impala pull out from the curb" and attempt to drive around Detective Drake's vehicle. Detective England watched the Impala accelerate and "ma[k]e contact with Detective Drake's car." Detective Drake was inside his car when it was hit by the Impala. He was scared and a little sore but did not seek medical attention.

- 4 -

Detective Drake's car sustained $644 in damage. Officer Young also "braced for impact," expecting to be hit by the Impala.

The driver of the Impala did not stop the car after hitting Detective Drake's car, but accelerated again, turning into the alley to flee the area. Officer Young turned his car around and followed the Impala. Detective England was also able to turn his car into the alley, following the Impala with the confidential informant still inside. Detective England recalled that the Impala was speeding "excessively fast in the alley," hitting trash cans and creating a "very hazardous situation to [the police] and [the driver] and anybody else that had been out in the area." Officer Young recalled that the Impala was "kicking up" a lot of dust. Detective England's car reached a speed of around 40 miles an hour to try to keep up with the Impala. At one point, the Impala became airborne. The chase lasted a total of about two blocks, and the Impala sped through at least one intersection without even slowing down before the vehicle eventually came to rest up against a tree.

After the Impala came to a stop, about five detectives and one sergeant were on the scene, including Detective Drake and Officer Young. Detective England arrived at approximately 6:20 p.m. The engine of the Impala was still running, but Defendant was no longer inside the vehicle. Detective England and other officers thought that Defendant "bailed out [of the car] somewhere between, right before Douglas, but right . . . before the car actually crashed out." The confidential informant explained to officers that she was able to crawl over into the driver's seat to stop the vehicle.

At that point, officers surmised that they had probable cause to believe that there were narcotics inside the vehicle. Detective Drake conducted the search of the vehicle. The majority of the items were located inside the center console, which was a bit cattywampus, presumably from the collision. A wallet was found in the center console. It contained identification belonging to Defendant, in addition to an expired insurance card containing Defendant's printed name and a debit or credit card with Defendant's printed name. A marijuana blunt was discovered next to the wallet. The marijuana weighed approximately one gram. Detective England also located a cell phone inside the vehicle and photographs of Defendant with his family. The keys in the car were attached to a leather lanyard with "Mr. Buford" inscribed on one side and "Mrs. Buford" inscribed on the other side.

When Detective Drake removed a loose portion of the vehicle's dashboard, he discovered a white plastic bag containing 4.2 ounces (or 119 grams) of cocaine. Detective Drake explained that usually a "[s]treet-level [sale weighed] basically a tenth of a gram up to a half of a gram and sometimes a whole gram." The cocaine discovered in the dash of the Impala was "very hard, as if it ha[d] been broken directly off of a brick." Detective Drake described the cocaine as "whiter powder than what [he was] used to,"

indicating that it had not been "cut." Detective Drake explained that most street-level dealers "cut" pure cocaine with another product, "typically a white powder of some kind so that they can stretch the amount that they have" to increase the amount of product by "a half or a 50-percent ratio or something along those lines." Detective Drake estimated that the street value of the cocaine recovered from the car was $12,000 before it was cut and approximately $24,000 if it was cut with another powder.

Once the Impala was stopped and officers conducted the search, Detective England initiated a call at 6:20 p.m. and again at 6:49 p.m. from his cell phone to the number used by the confidential informant to arrange the drug transaction. Both of these calls rang the telephone found inside the Impala during the search. Detective England later secured a search warrant for the cell phone found in the vehicle. Detective England delivered the cell phone to Detective Chris Brennan for analysis. Detective Brennan used a service called Cellebrite to extract information from the cell phone. This information was given to Detective England on a zip drive, and the cell phone was returned to the property room. An examination of the call log from the cell phone found in the vehicle indicated that the phone received an incoming call from Detective England's cell phone at 6:06 p.m. on November 16. The call log indicated that the call was not answered. The cell phone received another call from Detective England's cell phone at 6:08 p.m. Detective England's testimony indicated that this call was initiated by the confidential informant, answered by the person holding the cell phone found in the Impala, and lasted for approximately one minute and thirty-eight seconds. Detective England's phone received an incoming call from the phone number of the cell phone found in the Impala at 6:10 p.m. This call was also answered by the confidential informant and lasted for forty-four seconds. Detective England's phone received another call from the phone found in the Impala at 6:14 p.m. This call was answered by the confidential informant and lasted approximately twenty-six seconds.

The cell phone found in the Impala also made several calls to and received several calls from Evonnae Buford's cell phone number on the day of the incident. Mrs. Buford was Defendant's wife and the owner of the Impala. Additionally, the cell phone found in the Impala contained at least one picture of Defendant's daughter and a video of Defendant and Mrs. Buford. These items were sent to the cell phone found in the Impala from Mrs. Buford's cell phone.

According to Detective England, the call log from the cell phone found in the Impala showed calls made to contacts in the cell phone with names like "My dog," "Cuz dirty," "Drew," and "Joe." Mrs. Buford's telephone number appeared in the call log but her name was not labeled in the contacts of the cell phone. However, Detective England explained that it was not unusual for "drug dealers" to refrain from placing information about their family on their "drug phone."

Sergeant Layne reviewed several text messages from the cell phone found in the Impala. One of the text messages stated, "I need a 15." Three additional text messages stated, "I got 64 ball"; "I need a 20"; and "half a g." Other text messages referenced meeting locations and times. Sergeant Layne testified that the text messages contained "slang" for "a possible drug meeting or someone looking to purchase narcotics."

Detective Drake denied being responsible for the confidential informant and did not know the whereabouts of confidential informant at the time of trial. Detective Drake explained that he was not the detective assigned to the confidential informant. Detective England, on the other hand, admitted that he was responsible for the confidential informant during the incident. He knew the identity of the informant but did not know her whereabouts at the time of trial. Detective England had a telephone number for the informant but was unable to reach her prior to trial. He "looked on and off for her for probably a month" prior to trial by calling her and visiting several addresses listed in her contact information. He also put out an alert on the "RMS System," so if the confidential informant was stopped by the police, Detective England would have been notified. Detective England admitted that he could not locate the confidential informant.

Mrs. Buford testified on behalf of Defendant at trial. On the day of the incident, she drove her Impala with darkly tinted windows to the "orange" store near Douglas Avenue. It was around 5:30 p.m., and she was accompanied by her six-year-old son. When she got to the market, she left her car running while she and her son went in to the store to buy a few snacks for her son. When she came out of the store, she "thought somebody was playing a joke on [her] because [the Impala] was gone." Mrs. Buford explained that she spent "about 10 to 15 minutes" looking for her phone and could not call anyone because her son had been playing on the phone and the phone was "dead." She borrowed a charger from someone and charged her phone for a few minutes so that she could call her mother. After Mrs. Buford called her mother, she called the police. She waited a few minutes for the police, but it was "cold and raining," so she walked with her son to her father's house nearby. Mrs. Buford explained that it took 20 to 25 minutes to walk to her father's house but later admitted that it was only approximately three blocks and could not explain why it took that long to walk that distance. The police eventually came to her father's house. According to Mrs. Buford, the officer indicated that it was Defendant who had her Impala. The officer reminded her that it was a crime to make a false report. Mrs. Buford told the officer that if Defendant stole her car, she wanted to prosecute him. According to Mrs. Buford, the officer accused her of lying and told her that a detective would have to take the report. Mrs. Buford claimed that a detective never called her about making a report but that she was at some point "served with a warrant that [she] was lying."

Mrs. Buford identified the wallet that was found in the Impala and confirmed that it belonged to Defendant but explained that it was an old wallet. Mrs. Buford also

identified the keychain found in the Impala and admitted that it was hers. When asked to identify the cell phone found in her Impala, Mrs. Buford claimed that she did not recognize the phone. She admitted that the call log reflected that she sent text messages to the phone found in the car from her cell phone, including one that stated, "pull-ups and Krystal, a fry, double-cheese Krystal and some honey barbecue boneless wings, fresh fries, you don't have to come yet, they open 24 hours," but she could not recall if she sent the text to Defendant. Mrs. Buford was questioned about several text messages from her cell phone to the phone found in the Impala. However, when confronted with each one of these text messages, Mrs. Buford could not definitively say that she sent the text messages to Defendant. Mrs. Buford admitted that the call log from the phone found in the Impala contained several telephone calls from her cell phone to that phone on the day of the incident. Mrs. Buford claimed that she did not remember who she talked to or if she was even the person that made the calls.

Defendant submitted evidence of an alibi at trial. Richard Leyba, an employee of Style and Glo auto body repair shop, testified that Defendant was working at the shop on the day of the incident. Specifically, Defendant came to work that morning around 8:00 or 9:00 a.m. and left around 5:00 or 6:00 p.m. He identified a hand-written time sheet from November 16, 2016, that reflected Defendant worked from 9:23 a.m. to 7:20 p.m. He recalled working with Defendant that day. Mr. Leyba admitted that he had two prior convictions for theft from 2013.

Earl Havey Jaynes, the owner of Style and Glo Auto Repair, testified that he "[v]aguely" recalled the day of the incident. He explained that if the time sheet "said [Defendant worked on November 16] or if [Mr. Jaynes] initialed it, then [Defendant] did." Mr. Jaynes explained that he was not able to provide any additional documents reflecting that Defendant worked on the day of the incident or that Defendant was even an employee of the shop because the business had moved to a different location and paperwork was "in boxes." He recalled that Defendant filled out a W-9 and thought that he "probably" had a copy of the document but was not sure of its location.

In rebuttal, the State called Detective Drake, who explained that when a car is reported stolen by a spouse, the police department is unable to process it as a stolen car because it is "considered shared property." Detective Drake also explained that it was not raining but was clear on the day of the incident. Additionally, Steve Turner of the District Attorney's Office testified that he visited the Shine and Glo Auto Repair shop and asked for paperwork like W-2s, W-9s, W-4s, or more time sheets that would reflect Defendant's employment. Initially, Mr. Jaynes told Mr. Turner that he had the paperwork. When Mr. Turner returned to retrieve the paperwork, Mr. Jaynes said that he could not find the documents. The State recalled Detective Brennan to testify that he was able to locate an email account associated with the cell phone. The account was

identified as McDowellJemesia@gmail.com.[1]   Additionally, Detective Brennan testified that cell tower location information indicated that at 2:09 p.m. and 2:10 p.m., the cell phone found in the Impala was not near Style and Glo Auto Repair Shop but was actually located closer to the market from which Mrs. Buford's car was "stolen."

The jury found Defendant guilty of possession of .5 grams or more of cocaine with intent to sell, aggravated assault, felony evading arrest, evading arrest, vandalism of property valued at $500 or more but less than $1000,[2] and simple possession.  Defendant was found not guilty of leaving the scene of an accident.  The trial court determined that Defendant was a career offender and sentenced Defendant to a thirty-year sentence for the conviction for possession of .5 grams or more of cocaine with intent to sell and assessed a $10,000 fine.  The trial court sentenced Defendant to fifteen years for the aggravated assault conviction, twelve years for the felony evading arrest conviction, and eleven months, twenty-nine days for each of the following convictions: evading arrest, vandalism, and simple possession.  The sentences were ordered to run concurrently.  As a result, Defendant's total effective sentence was thirty years.

Defendant filed a motion for new trial in which he raised the following issues: (1) the trial court erred in failing to give the missing witness instruction; (2) the State erred by failing to maintain the recording of the confidential informant's drug purchase; (3) the evidence was insufficient to support the convictions; (4) the indictment was constitutionally and procedurally insufficient; (5) the indictment was multiplicitous; (6) Defendant was arrested without probable cause; (7) the trial court erred in admitting recorded and unrecorded statements of Defendant after his arrest; and (8) Defendant was denied a fair jury trial because a "disproportionate number of African-American jurors from the venire were excused[.]"  After the denial of the motion for new trial, Defendant filed a timely notice of appeal.

---

[1] Mrs. Buford identified Jemesia Buford as the name of one of her children.

[2] The original judgment form entered on May 16, 2018, classified Defendant's vandalism conviction as a Class A misdemeanor with a sentence of eleven months and twenty-nine days.  The trial court issued a corrected judgment form on May 1, 2019, changing the classification of the vandalism conviction to a Class E felony with a sentence of eleven months and twenty-nine days.  Vandalism is "punished as for theft under [section] 39-14-105, after determining value under [section] 39-11-106." T.C.A. § 39-14-408.  Defendant's offense of vandalism occurred on November 16, 2016, prior to the amendment of the theft statute, but Defendant was convicted and sentenced after the effective date of the new version of the theft statute.  *See* 2016 TN Pub Acts, c. 906, §5.  Defendant should have been sentenced for the crime of vandalism less than $1,000, a Class A misdemeanor rather than a Class E felony.  *See State v. Menke*, No. M2017-00597-SC-R11-CD, ___ S.W.3d ___, 2019 WL 6336427, at *11 (Tenn. Nov. 27, 2019) (applying the Criminal Savings Statute to the amended theft grading statute).  On remand, the trial court should enter a corrected judgment form reflecting Defendant's conviction offense of vandalism less than $1,000, a Class A misdemeanor, with a sentence of eleven months and twenty-nine days.

*Analysis*

## I. Failure to Preserve Audio Recording

On appeal, Defendant insists that the trial court erred in refusing to dismiss the charges against him due to the State's failure to preserve the recording of the alleged drug transaction. Specifically, Defendant cites to *State v. Ferguson*, 2 S.W.3d 912 (Tenn. 1999), to support his position that he was denied a fair trial by the State's failure to preserve the recording. The State disagrees.

The Due Process Clause of the Fourteenth Amendment to the United States Constitution provides every defendant the right to a fair trial. To facilitate this right, a defendant has a constitutionally protected privilege to request and obtain from the prosecution evidence that is either material to guilt or relevant to punishment. *Brady v. Maryland*, 373 U.S. 83, 87 (1963). Further, the prosecution has a duty to turn over exculpatory evidence that would raise a reasonable doubt about a defendant's guilt. *United States v. Agurs*, 427 U.S. 97, 110-11 (1976).

The State has a general duty to preserve all evidence subject to discovery and inspection as part of Tennessee Rule of Criminal Procedure 16. The Tennessee Supreme Court has observed that "the due process required under the Tennessee Constitution [is] broader than the due process required under the United States Constitution" and rejected the "bad faith" analysis espoused by the United States Supreme Court in favor of "a balancing approach in which bad faith is but one of the factors to be considered in determining whether the lost or destroyed evidence will deprive a defendant of a fundamentally fair trial." *State v. Merriman*, 410 S.W.3d 779, 784-85 (Tenn. 2013) (quoting *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988) (holding that "[u]nless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law")). Our supreme court "observed that fundamental fairness, as an element of due process, requires a review of the entire record to evaluate the effect of the State's failure to preserve evidence." *Id.* at 784-85 (citing *Ferguson*, 2 S.W.3d at 914, 917).

Our state supreme court adopted a multi-part test for courts to use in determining whether the loss or destruction of evidence has deprived a defendant of a fair trial. *Ferguson*, 2 S.W.3d at 917. The first step is to determine whether there was any duty to preserve evidence:

> Whatever duty the Constitution imposes on the States to preserve evidence, that duty must be limited to evidence that might be expected to play a significant role in the suspect's defense. To meet this standard of

constitutional materiality, evidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means.

*Id.* (quoting *California v. Trombetta*, 467 U.S. 479, 488-89 (1984)). The court explained that if the proof demonstrates the existence of a duty to preserve the evidence and demonstrates that the State failed in that duty, "the analysis moves to considerations of several factors which guide the decision regarding the consequences of the breach." *Id.* Those factors include: "(1) The degree of negligence involved; (2) The significance of the destroyed evidence, considered in light of the probative value and reliability of secondary or substitute evidence that remains available; and (3) The sufficiency of the other evidence used at trial to support the conviction." *Id.* If, after considering all the factors, the trial judge concludes that a trial without the missing evidence would not be fundamentally fair, the trial court "may then impose an appropriate remedy to protect the defendant's right to a fair trial, including, but not limited to, dismissing the charges or providing a jury instruction." *Merriman*, 410 S.W.3d at 785-86.

We review the trial court's decision concerning the fundamental fairness of a trial conducted without the "missing" evidence under a de novo standard of review. *Id.* at 791. If this Court concludes that the trial would be fundamentally unfair in the absence of the lost evidence, this Court will apply an abuse of discretion standard to review the appropriateness of the remedy imposed by the trial court. *Id.* at 792.

To begin our analysis, we must first determine whether the State had a duty to preserve the evidence. The evidence must have had, according to *Ferguson*, "an exculpatory value that was apparent before the evidence was destroyed." 2 S.W.3d at 917 (quoting *Trombetta*, 467 U.S. at 488-89). Additionally, the evidence has to be unobtainable by other "reasonably available means." *Id.*

At trial, Defendant called for a jury-out hearing to "create a record of the lost recording for the *Ferguson* issue for the appellate courts." The trial court was not certain that the "lost recording really ha[d] anything to do with [the case]" because the State withdrew the charge pertaining to the sale of cocaine prior to trial but allowed Defendant to present the evidence for the record. After the jury-out hearing, counsel for Defendant determined that he wished to present the testimony with regard to the "lost recording" to the jury.

Once the jury returned to the courtroom, Detective England testified that the deal between the confidential informant and Defendant was recorded on a handheld audio recording device. Detective England recalled "small conversation" prior to what he thought was the exchange of money for drugs. At that point, officers moved in for the

- 11 -

take-down, and Defendant fled in the car. Detective England recalled that Defendant could be heard screaming, "How could you do this to me? How could you do this to me?" The recording "got deleted off the recorder on accident." Detective England explained that at the time, he was "going through a divorce" and had some other "personal issues," and he "pure and simply didn't do what [he] was supposed to do in this case." Detective England admitted that it was his fault for failing to preserve the recording but explained that the "rest of [his] team observed the same thing as [he] did, if they had a wire." Officer Young also testified that he heard the transaction in real time and listened to a copy of the recording after the incident.

In this case, from the proof presented, it does not appear that the audiotape from the controlled buy was the type of exculpatory evidence that the State had a duty to preserve under *Ferguson*. While the evidence certainly could not have been obtained from any other source, it did not have "an exculpatory value that was apparent before the evidence was destroyed." *Ferguson*, 2 S.W.3d at 917 (quoting *Trombetta*, 467 U.S. at 488-89). If anything, the evidence implicated Defendant in the transaction. According to the testimony of Detective England, the audiotape was broadcast in real time to members of the crime suppression unit on the day of the incident. Multiple officers listened to the transaction and watched the events unfold in real time. When Detective England "heard what we thought was a good deal, which [was] the narcotics had been exchanged for our money," he heard who he "believe[d] to be [Defendant] . . . screaming at the top of his lungs" at the confidential informant, asking her "why" she did this to him. Thus, the exculpatory value of the evidence was not apparent, and a trial without the audiotape would not be, in our view, fundamentally unfair. Defendant's theory at trial was that he was not even present during the transaction. Even without the audiotape of the drug transaction, there was at least one officer, Sergeant Layne, who identified Defendant as the driver of the Impala in which the drug transaction took place. Moreover, the State voluntarily dismissed the drug sale charge due their failure to preserve the audiotape and did not mention the content of the interaction between Defendant and the confidential informant until Defendant brought the missing evidence question to the jury's attention. Because we determine that the State was under no duty to preserve the evidence, it becomes unnecessary to apply the *Ferguson* factors or to determine, as Defendant suggests, whether the trial court should have imposed an appropriate remedy such as issuing a jury instruction on missing evidence. Defendant is not entitled to relief on this issue.

## II. Missing Witness Instruction

Defendant next claims that the trial court erred by failing to give a missing witness instruction to the jury. The State, on the other hand, insists that Defendant waived this issue for failing to request the instruction in writing. In the alternative, the State argues

that Defendant failed to show that the confidential informant was available to testify or that he was entitled to the pattern jury instruction on an absent material witness.

During discussion on the jury instructions, counsel for Defendant asked for a jury instruction on the missing confidential informant. The trial court explained that there were four things the trial court was required to examine prior to giving the instruction: (1) whether the witness had knowledge of material facts; (2) whether the facts were available only to the party who did not call the witness to testify; (3) whether a relationship exists between the witness and the party who did not call the witness that would naturally incline the witness to favor the party; and (4) whether the missing witness could have been subpoenaed to testify. The trial court found that the proof did not support the instruction when examining all four of those elements.

Of course, "a defendant has a right to a correct and complete charge of the law," *State v. Farner*, 66 S.W.3d 188, 204 (Tenn. 2001), and the trial court has the duty to give "a complete charge of the law applicable to the facts of the case." *State v. Davenport*, 973 S.W.2d 283, 287 (Tenn. Crim. App. 1998). Tennessee law, however, does not mandate that any particular jury instructions be given, so long as the trial court gives a complete charge on the applicable law. *See State v. West*, 844 S.W.2d 144, 151 (Tenn. 1992). A charge is prejudicially erroneous "if it fails to fairly submit the legal issues or if it misleads the jury as to the applicable law." *State v. Hodges*, 944 S.W.2d 346, 352 (Tenn. 1997) (citing *State v. Forbes*, 918 S.W.2d 431, 447 (Tenn. Crim. App. 1995); *Graham v. State*, 547 S.W.2d 531 (Tenn. 1977)). Whether the trial court properly instructed the jury is a mixed question of law and fact. *State v. Thorpe*, 463 S.W.3d 851, 859 (Tenn. 2015); *State v. Rush*, 50 S.W.3d 424, 427 (Tenn. 2001). Accordingly, the standard of review is de novo with no presumption of correctness.

Here, Defendant did not submit a written request for a jury instruction on the missing witness. Rule 30 of the Tennessee Rules of Criminal Procedure provides that requests for a special jury instruction be in writing. *State v. Vickers*, 985 S.W.2d 1, 8 (Tenn. Crim. App. 1997); *State v. Brewer*, 932 S.W.2d 1, 15 (Tenn. Crim. App. 1996). Moreover, Defendant failed to submit a transcript of the jury instructions as part of the record on appeal. The record submitted to this Court contains only the written jury instructions. Rule 24(b) of the Tennessee Rules of Appellate Procedure provides that "the appellant shall have prepared a transcript of such part of the evidence or proceedings as is necessary to convey a fair, accurate and complete account of what transpired with respect to those issues that are the bases of appeal." This Court has previously cautioned that

> [f]ailure to include a transcript normally waives review of appellate issues pertaining to jury instructions because without a complete record, it is impossible for this court to discern whether the written jury instruction

- 13 -

conforms to the instructions as read to the jury and thus, whether error actually occurred. *See* Tenn. R. App. P. 24(b); *State v. Jones*, 623 S.W.2d 129 (Tenn. Crim. App. 1981).

*State v. Dedonnas R. Thomas*, No. W2000-01465-CCA-R3-CD, 2002 WL 1558687, at *7 (Tenn. Crim. App. Jan. 30, 2002), *no perm. app. filed*; *see also State v. Andrew Douglas Rush*, No. M2009-02253-CCA-R3-CD, 2010 WL 4868086, at *7 (Tenn. Crim. App. Nov. 29, 2010), *perm. appeal denied*, (Tenn. Apr. 13, 2011); *State v. Walter Wilson*, No. W2001-01463-CCA-R3-CD, 2002 WL 31259461, at *5 n.2 (Tenn. Crim. App. Sept. 4, 2002), *perm. app. denied* (Tenn. Jan. 27, 2003); *State v. Thomas Mitchell*, No. W1998-00509-CCA-R3-CD, 1999 WL 1531758, at *4 n.2 (Tenn. Crim. App Dec. 20, 1999), *perm. app. denied* (Tenn. June 12, 2000). Absent plain error, Defendant is not entitled to relief. Tenn. R. App. P. 36. Defendant has pointed to no unequivocal rule of law that has been breached; there is no plain error.

## III. Violation of <u>Brady v. Maryland</u>

Defendant claims that the State "committed a *Brady* violation by failing to disclose the personnel records of the detective in charge of the operation." The State insists that this issue is waived, and we agree. The record does not contain a *Brady* motion. The trial court did not have a *Brady* hearing. Defendant did not raise a *Brady* claim in his motion for new trial, and the transcript of the hearing on the motion does not contain discussion of any *Brady* claim. Because this issue was not presented to the trial court, it is waived. *See State v. Harbison*, 539 S.W.3d 149, 164-65 (Tenn. 2018) (citing *Waters v. Coker*, 229 S.W.3d 682, 689 (Tenn. 2007); *Boyd v. Hicks*, 774 S.W.2d 622, 625 (Tenn. Ct. App. 1989)).

## IV. Additional Issues

Defendant raises the following additional issues, which we have reproduced herein verbatim, including the numbering, as they appear in the brief submitted by Defendant to this Court:

(1) The evidence was insufficient to convict [Defendant];
(2) The indictment was constitutionally and procedurally insufficient as to [Defendant];
(3) The indictment was multiplicitous in violation of the state and federal constitutional prohibitions against notice and double jeopardy;
(4) [Defendant] was arrested absent probable cause, and the introduction at trial of all recorded and unrecorded statements of [Defendant] following his arrest was erroneous and deprived [Defendant] of a fair trial;

(7) [Defendant] was denied a fair jury trial because during jury selection a disproportionate number of African-American jurors from the venire were excused due to employment, family, and other hardships or because of beliefs about the imposition of the death penalty.[3]

The State contends that these issues are waived for failure to cite to the record, cite to authority, or include any argument to support the issues. We agree. These issues are waived. Tenn. Ct. Crim. App. R. 10(b); Tenn. R. App. P. 27(a)(7).

*Conclusion*

For the foregoing reasons, the judgments of the trial court are affirmed. However, we remand the case to the trial court to enter a corrected judgment form for Count 6 to reflect a conviction for vandalism less than $1,000, a Class A misdemeanor, with a sentence of eleven months and twenty-nine days.

_____
TIMOTHY L. EASTER, JUDGE

---

[3] The "Issues" section of Defendant's brief also posits "[w]hether the evidence present at trial was sufficient to convict the Defendant of the crime of First Degree Murder." Defendant was not charged with first degree murder nor was he eligible for the death penalty. Defense counsel conceded at oral arguments that these issues were errors in the brief and did not apply to this case.